341 F.Supp. 1207 (1972)
Fred E. CHRISTIAN, Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
No. 69 C 229(A).
United States District Court, E. D. Missouri, E. D.
April 25, 1972.
Louis Gilden, St. Louis, Mo., for plaintiff.
Barnard, Timm & McDaniel, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
HARPER, District Judge.
Plaintiff, Fred E. Christian, a black citizen, filed suit against defendant, General Motors Corporation (Chevrolet Division, St. Louis, Missouri), alleging that defendant violated sections 703(a) and 704(a) of the Civil Rights Act of 1964 [42 U.S.C.A. §§ 2000e-2(a) and 2000e-3(a)] by discharging plaintiff because of his race and because of his complaints against defendant's discriminatory practices. Before filing suit, plaintiff complied with the statutory requirements of 42 U.S.C.A. § 2000e-5. This court has jurisdiction under 42 U.S.C.A. § 2000e-5(f).
The pertinent sections of the Civil Rights Act of 1964 read:
"2000e-2. Unlawful employment practices  Employer practices.

"(a) It shall be an unlawful employment practice for an employer 
"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; * * *.

*1208 "2000e-3. Other unlawful employment practices  Discrimination for making charges, * * *
"(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
"2000e-5. Enforcement provisions * * *.
"(f) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter."
The issues for decision are basically ones of fact to be determined from the evidence. The burden of proof in this case is upon the plaintiff to show by a preponderance or greater weight of the credible evidence that a violation of the Act occurred. See Dewey v. Reynolds Metals Co., 429 F.2d 324, 328 (6th Cir. 1970); Green v. McDonnell-Douglas Corp., 318 F.Supp. 846, 850 (E.D.Mo. 1970), rev'd on other grounds, No. 20,596 (3/30/72, 8th Cir.); Andres v. Southwestern Pipe, Inc., D.C., 321 F. Supp. 895, aff'd 446 F.2d 899 (5th Cir.)
Prior to the court's assessment of the various contentions relating to discrimination, it must be recognized that there are numerous factual areas in this case in which the evidence is in sharp conflict, thereby obligating the court to assess credibility of the witnesses in order to determine what version of an incident is believable. This the court has done by reviewing the various claims leveled by the parties.
Plaintiff was hired in August, 1964, by defendant at the St. Louis Plant, Chevrolet Division. In the course of his employment plaintiff was promoted to the position of assembly inspector, then to mechanical trim inspector, and in February, 1967, to road and roll test inspector. This job entails the initial inspection of automobiles in regard to their vital fluids and safety features. In making this inspection, plaintiff would start the automobile for the first time and then drive it under simulated road conditions on a mechanical roller device.
The testimony indicates that until March, 1967, plaintiff had enjoyed a good relationship with his co-workers and supervisory personnel. His work for defendant seems to have been more than satisfactory as evidenced by his promotions and by several awards plaintiff received for his suggestions.
In March, 1967, plaintiff worked on the second shift in the Corvette plant. The hours of the second shift were from 4:30 p. m. to 1:00 a. m., with a lunch break from 8:30 p. m. to 9:00 p. m. The managerial personnel in the Corvette plant at that time included Mr. Marty Voss, inspection foreman and plaintiff's immediate supervisor since February 16, 1967; Mr. Robert Blubaugh, general foreman of inspection; Mr. Ralph Koonce, general foreman of production; Mr. Fred Faller, assistant superintendent of production; Mr. Glenn Huber, superintendent of production; and Mr. Tedd Hansen, labor relations representative.
The first incident involving plaintiff occurred on March 5th or 6th, 1967. Mr. Huber and Mr. Koonce were approaching the area of the road and roll test when they heard the squealing of tires. When they reached the roll test area they saw plaintiff getting out of an automobile. Where the car was previously parked there were heavy black wheel marks extending about eight feet in length. Mr. Huber asked plaintiff about the marks. Plaintiff denied making them. Mr. Huber asked Mr. Koonce to contact plaintiff's foreman, but plaintiff received no discipline.
*1209 On March 8, 1967, plaintiff drove a Corvette he was inspecting into the chassis line pit. At the trial, plaintiff testified that the car was placed on the assembly line wrong, in that the wheels were too close to the rim of the pit. Plaintiff said that when he proceeded to drive the car from the conveyor belt to the road and roll test area he found it impossible to turn the wheels on the car. As a result, the car ran over the rim of the pit and part of the suspension dropped into the pit, damaging the right lower quarter panel, the bumper, and the attachment parts. No supervisory personnel were in the area at the time of the accident. Mr. Voss came into the area shortly thereafter.
Mr. Voss testified that after plaintiff confirmed that he was not hurt he asked plaintiff what had happened. Plaintiff replied that the unit had defective steering and the car jumped into the pit. Mr. Voss testified that he observed tire marks three or four feet long at the area where plaintiff initially starts the vehicle. Mr. Voss immediately checked the steering and found it was okay. This accident occurred after midnight on the March 7th shift. At 1:45 a. m., Mr. Voss put plaintiff on notice for violation of shop rule 18 (making scrap unnecessarily or careless workmanship). On the shift of March 8th, at 6:15 p. m., Mr. Voss assessed plaintiff a reprimand for violation of the shop rule. No disciplinary layoff was assessed. Later that shift plaintiff filed a grievance protesting the reprimand.
Between March 8 and April 19, 1967, no serious incidents occurred, but the good relationship between plaintiff and the management began to deteriorate. Plaintiff testified that after March 8th he began to be more critical and severe in his inspection of cars. He started rejecting borderline defects that he had previously passed. He spent more time inspecting each car and, as a result, production was slowed considerably. Mr. Huber began spending more time in plaintiff's area and would advise plaintiff that some of the items he rejected should be okayed.
On April 13th, plaintiff told Mr. Blubaugh that he had too much work. Mr. Blubaugh had the work standards department make a three-day observation of plaintiff's operation. The only change in plaintiff's job assignment subsequent to the observation was that the engine r. p. m. was changed in the first gear operation. There was no change in the number of duties assigned to plaintiff.
On April 18th, a meeting was held in the office of Mr. Tesky, general superintendent of Corvette production. Mr. Tesky cited alleged infractions in plaintiff's work habits. He said plaintiff was taking too long to inspect the jobs and that plaintiff was "goofing off". Plaintiff said Tesky stated that there was time to do the job adequately if plaintiff would spend less time on each unit, and so forth and so on. When plaintiff stated that his normal time to roll test a unit was approximately two minutes, Mr. Blubaugh read to him that the time study showed plaintiff spent only a minute or less roll testing a unit, and that the observation also showed plaintiff spent as much as nine minutes standing idle and talking to other employees between each vehicle he roll tested.
On March 31st, plaintiff was put on notice of violation of shop rule 18 for talking to another inspection employee outside the plaintiff's area while units were waiting to be roll tested. No discipline was assessed, however.
On April 14th, Mr. Huber observed plaintiff and another employee outside of the plant before the lunch whistle had blown. Later in the day Mr. Faller held a meeting with plaintiff and told him this was a violation of shop rules. A similar meeting was held with the other employee. No discipline was assessed. Other employees were also interviewed and told that leaving work early would not be tolerated.
From March 8th through April 20th, plaintiff filed about eight grievances. *1210 Several of these alleged discrimination, but most of them followed and pertained to reprimands.
On April 19th, the cars coming into plaintiff's area had signs placed on the seats or dashboard. These signs read, "We hate niggers", "Blackpower wins again", "We demand equal rights for white inspectors", "We protest General Motors discriminating against white inspectors", and "Free black shoe polish to all white Corvette inspectors". Mr. Huber, when he learned of the signs, ordered all of them to be collected and brought to the conference room. The production supervisors were called in to report their findings about the signs. The supervisor's investigation consisted of on-the-spot interviews with employees. The investigation lasted approximately one hour. Mr. Shied, supervisor of hourly personnel, held a meeting with Mr. Roberds and Mr. Hill, district and zone committeemen, and asked them if they were aware of any union people who had placed the signs. He told them to advise management at any time if they found who placed the signs in the cars so that the necessary action could be taken. The person or persons responsible were never discovered. No further incidents of this nature occurred.
On April 20th, at 6:00 p. m., Mr. Voss observed plaintiff testing an automobile. Mr. Voss' testimony as to the exact time period during which plaintiff drove the car is confusing. It is not clear whether plaintiff entered the car shortly before 6:00 p. m. or at 6:00 p. m., or whether plaintiff finished driving the car at 6:06 p. m. or after 6:06 p. m. Plaintiff testified he tested the car about seven and half to eight minutes in order to determine where a noise in the car was coming from. Mr. Voss testified that plaintiff drove the car a total of eleven minutes at a constant speed of fifty-five miles per hour, and that during this time plaintiff sat in a fixed position with his arm leaning over the door and one hand on the steering wheel. Plaintiff was not going through any of the test movements. Mr. Voss approached plaintiff at 6:03 p. m. and asked him if he were having any problem. Plaintiff replied he was not. Mr. Voss testified he could smell the car overheating while plaintiff drove the car. After plaintiff finished driving the car, Mr. Voss asked plaintiff why he had run the car so long. Plaintiff replied he was just doing his job. The car's speed-ometer had eleven miles registered on it. As a result it had to be replaced. At 8:30 p. m., plaintiff was given a disciplinary layoff for the balance of the shift and one day for violation of shop rule 28 (abuse, misuse, or deliberate destruction of company property, tools, equipment, or property of employees in any manner).
Mr. Tedd Hansen was contacted at about 6:30 p. m. because of the discipline being considered against plaintiff. Plaintiff, Mr. Hansen, and Mr. Thomas, committeeman, met in the labor relations office. Mr. Hansen asked plaintiff what could be done to alleviate the problems plaintiff was having. Plaintiff replied that he thought there were discriminatory practices by defendant and that he was being discriminated against. At this point the testimony as to what was said differed greatly. According to the testimony of plaintiff and Mr. Thomas, Mr. Hansen remarked, "You feel that we discriminate against niggers here?" Plaintiff became angry and left the room. Mr. Hansen then purportedly told Thomas, "That nigger is going to hit the street," and, "We're going to fire that nigger." Plaintiff was convinced to return to the meeting.
Mr. Hansen then purportedly told plaintiff that if he did not stop suggesting racial discrimination he would be subject to a series of disciplinary layoffs until he stopped doing so. A suggestion was then made that Mr. Hansen, to show good faith, should have the reprimand removed. Mr. Hansen left and met with other management officials about this, but returned to say that he could not have it removed. Mr. Hansen's version of this part of the meeting was that he told plaintiff that if plaintiff *1211 did not straighten up his job assignment and do the job in a manner that was satisfactory to management it could only result in further disciplinary action. Plaintiff then told Mr. Hansen he wanted the reprimand removed if he was to make a clean start. When Mr. Hansen replied that the reprimand would be resolved in accordance with the grievance procedure, plaintiff left the room. Plaintiff returned shortly thereafter but then left again.
Plaintiff returned to work about 7:45 p. m. At 8:20 p. m., Mr. Voss gave plaintiff the disciplinary layoff of the balance of the shift plus one day. Plaintiff, Mr. Voss, Mr. Hansen and Mr. Faller went to the cafeteria to await union representation so that they could conduct a disciplinary interview. Mr. Faller placed the call for union representation. Plaintiff testified that Mr. Hansen proceeded to hold a disciplinary interview and that he told Mr. Hansen that he would not participate unless represented by the union. Plaintiff then left the cafeteria. Mr. Hansen and Mr. Faller overtook plaintiff in the hall and physically blocked his way. Mr. Hansen told plaintiff to return to the cafeteria and await his committeeman. After several attempts by plaintiff to get around Mr. Hansen and Mr. Faller, he started to go to the cafeteria, then turned and said, "You are being a bunch of Jackoffs, a bunch of pricks." Mr. Hansen then put plaintiff on notice for violation of shop rule 31 (use of abusive language to employee or supervisor). Plaintiff shook his finger in Mr. Faller's face and said, "You are being a Jackoff about this." Plaintiff refused to return to the cafeteria and was placed on notice by Mr. Hansen for failure to obey a direct order. Plaintiff replied, "Fuck your shop rules." Plaintiff then returned to the cafeteria. The others remained outside. Mr. Hansen went into the cafeteria once for ten to twenty minutes. Mr. Hansen and Mr. Faller left. Mr. Voss remained until Mr. Thomas, plaintiff's committeeman, arrived. A disciplinary interview was then conducted.
Plaintiff testified that while they were in the cafeteria Mr. Hansen said, "I told you this would happen. I told you this is a start of a series of disciplinary interviews. After this we are going to kick you right back out. As soon as you return from this one we are going to send you right back out again," and, "We're going to see that your black ass hits the street." Plaintiff also testified Mr. Faller stated, "All you niggers are alike. All you want to do is start trouble." Two employees who were having lunch in the cafeteria at this time testified that they heard Mr. Faller's remark.
When plaintiff returned to work on April 24th, he was assessed a disciplinary layoff of the balance of the shift, plus three days for his use of abusive language on April 20th. During this disciplinary interview, plaintiff read a book and, while the notice of disciplinary action was being read, plaintiff put his fingers in his ears.
On April 24th, Mr. Roy Richardson replaced Mr. Voss as supervisor of nine or ten inspectors on the assembly line. Plaintiff was one of these inspectors. On April 28th, Mr. Richardson was called to the repair area and shown two cars that had loud knocks in the engine. One of the engines had four nut and washer assemblies in it, two on top of one piston and two in the intake manifold. Mr. Richardson found that by opening the throttle these assemblies could be dropped down the intake throat of the carburetor. These assemblies were common to the assembly plant but not to the plant where the engines were manufactured. At about the same time Mr. Richardson was informed of the damaged engines, he was also informed of vehicles in which the instrument panels were cut. Mr. Richardson started checking vehicles further up the assembly line but found no damaged vehicles prior to the road and roll test. Toward the end of April, Mr. Leo Boyher, a patrolman with the security department, was assigned to keep the area on the final chassis line under surveillance after dark.
*1212 On May 2nd, Mr. Blubaugh observed plaintiff and Mr. Robinson, a white repairman, leaning over a vehicle. Plaintiff started the car and there was a loud knocking noise in the engine. Mr. Blubaugh then went over to the car and restarted it. Again the engine was noisy. The car was pushed off the end of the line. When the engine was later opened a nut was found on top of a piston. Mr. Robinson was reassigned from his job to the pit area.
Mr. Richardson was observing the engine being torn down when he received a call from patrolman Boyher. Mr. Boyher had been assigned to observe the final chassis line from the skylights that ran the length of the conveyor line. He was to report anything unusual or suspicious that he observed. Mr. Boyher reported and testified that about 10:30 p. m. he saw plaintiff work the accelerator linkage and crank the engine. The car backfired and a fire started in the carburetor. After about one minute, plaintiff got in the car and started the engine again. Once again the car backfired and flame came from the carburetor. Plaintiff got out of the car and the flame went out. Again plaintiff started the car which backfired and set the carburetor on fire. When plaintiff got out of the car the engine was not running and there was a fire in the carburetor. When the flame started to die, plaintiff pumped the accelerator linkage rapidly. When the flames again died down, plaintiff repeated the pumping of the accelerator linkage. Shortly thereafter, a Mr. Graff came over and extinguished the flame by smothering it with a rag.
Plaintiff testified that the carburetor leaked gas and the ignition wires were crossed, causing the engine to backfire by igniting the fuel in the carburetor. Fires in the carburetor are common when the engine is initially started. Plaintiff testified that he attempted to extinguish the fire by the normal procedure of pumping the gas pedal with the engine running so as to suck the fire down into the manifold. Mr. Richardson went to the road and roll test area and observed the carburetor which had the butterfly and the exterior portion of the carburetor blackened from the fire. The carburetor had to be replaced. Following this incident, plaintiff was assessed a disciplinary layoff for an indefinite time. This was later converted to a one-week disciplinary layoff.
When Mr. Boyher observed the fire he was situated twenty feet above plaintiff. The exhibits, showing Mr. Boyher's view from his different vantage points, demonstrate that in spite of the girders and pipes above the assembly line Mr. Boyher could clearly observe plaintiff from the roof.
When plaintiff returned to work on May 11th, he was reassigned to the mechanical trim inspection station. Plaintiff's job classification and rate of pay were not changed, however. Mr. Richardson also told plaintiff that he was restricted to certain areas of the plant and designated the areas plaintiff was not to enter. Plaintiff asked for a committeeman. Mr. Roberds arrived about an hour and a half later. Mr. Richardson was asked why plaintiff was reassigned. There is conflict in the testimony as to whether Mr. Richardson replied. Mr. Richardson testified that he answered that the reassignment was an attempt to isolate plaintiff from the area where the damage to the cars had occurred. Plaintiff and Mr. Roberds testified that Mr. Richardson refused to answer. Mr. Roberds told plaintiff that Mr. Richardson had not given a reason for restricting plaintiff from certain areas and, therefore, during plaintiff's relief, lunch peroid, and non-working hours, plaintiff had a right to go to those areas.
Mr. Richardson told Mr. Roberds that he was giving the plaintiff bad advice and if plaintiff violated the order it would result in disciplinary action. Mr. Roberds admitted during his testimony that there was no labor agreement that gave plaintiff the right to disobey Mr. Richardson's order. When plaintiff obtained relief he walked directly into the restricted area. This was done in the *1213 presence of Mr. Roberds and Mr. Richardson. When plaintiff returned, Mr. Richardson gave him a disciplinary layoff of two weeks for failing to obey a direct order.
Plaintiff returned to work on May 26th and was again assigned to the mechanical trim inspection station. Mr. Richardson later observed plaintiff sitting down with a hat pulled down to the bridge of his nose. Plaintiff was holding a job procedure booklet but was not reading it. After Mr. Richardson told plaintiff to work with the man who was assigned to break plaintiff into the job, plaintiff began working in a normal manner.
On the next day of work, May 31st, Mr. Richardson again observed plaintiff sitting down with a job procedure booklet in his hand. Mr. Richardson told plaintiff that he should be working with the man assigned to break plaintiff into the job. Plaintiff replied that he was studying the job procedure. After five minutes, Mr. Richardson told plaintiff to go to work. Plaintiff replied, "I'll get up but I won't do any goddam work." Mr. Richardson watched plaintiff work on five or six units. Plaintiff would make the electrical hookup on the unit, write down the model options on the inspection card, sit down, and ride through the inspection station listening to the car radio. Plaintiff did not perform the jobs required of a mechanical inspector at that station. Plaintiff testified that he was working to the best of his ability and was inspecting all cars. After the sixth unit went through the inspection station, plaintiff left the assembly line and sat down. Mr. Richardson then informed plaintiff he was assessing plaintiff a disciplinary layoff for violation of shop rule 16 (refusal or failure to do a job assignment). The layoff was for the balance of the shift plus thirty days.
After this, plaintiff was on sick leave from June to December. Plaintiff returned to work on December 4, 1967, and reported to Mr. Eugene Pierce, the inspection foreman. Mr. Pierce told plaintiff his job would be that of a mechanical trim inspector. Plaintiff stated that that was not his job, that he was a road and roll test inspector, and that was what he was going to do. After Mr. Pierce told plaintiff several times that his job was going to be a mechanical trim inspector, plaintiff finally agreed to go to the mechanical trim station. When they arrived there, however, plaintiff turned and went to the road and roll test operation and told Mr. Pierce that this was his job. Mr. Pierce told plaintiff twice to return to the mechanical trim operation before plaintiff did go back.
Plaintiff then requested to see Mr. Faller and Mr. Merrill Hall, general foreman of inspection. Plaintiff told them his job was road and roll test inspector and that was what he wanted to do. After being told to return to the mechanical trim operation, plaintiff complied and then requested union representation. Mr. Pierce placed a call for a committeeman. Plaintiff then got a pass to go to the nurse. After returning from the nurse he again went to Mr. Faller. Plaintiff told Mr. Faller of a letter that plaintiff's private physician had sent to defendant's lawyers advising them that plaintiff was capable of being returned to work lightly (Ex. 50). Mr. Faller told plaintiff that the plant doctor had indicated plaintiff was able to return to work without any restrictions.
After this meeting, plaintiff returned to the mechanical trim area and requested another pass to go to the nurse. Mr. Pierce left to get a pass for plaintiff. When he returned plaintiff was gone. Mr. Hall found plaintiff and gave him a direct order to return to the mechanical trim operation. Plaintiff accused Mr. Hall of threatening him and called for a committeeman. After Mr. Hall left, Mr. Pierce told plaintiff to go back to the mechanical trim operation. Plaintiff told Mr. Pierce he wouldn't perform that operation. Plaintiff then went to the inspection office. Mr. Prendergast, a labor relations representative, and Mr. Faller, both ordered plaintiff to return to his operation. Plaintiff refused and later went to lunch. When *1214 he returned he talked with his committeeman for about an hour. A disciplinary interview was then held and plaintiff was suspended indefinitely for failure to obey a direct order. The suspension was converted to a discharge after a review on the following day.
There was no evidence presented as to plaintiff's earnings while employed by defendant other than that his final hourly pay was $3.06 per hour. At this rate of pay, if plaintiff had worked a forty-hour week for fifty-two weeks his annual salary would have amounted to $6,364.80. Following plaintiff's discharge he earned $7,538.37 in 1968 and $15,190.32 in 1969. In the ten months previous to the start of the trial in 1970, plaintiff earned approximately $20,000.00 as a car salesman for Lindberg Cadillac Agency, where he was regularly employed.
In weighing the evidence in this matter, it is important to note that under the Civil Rights Act of 1964, an employer may discharge an employee for any reason except discrimination or because of the employee's opposition to any practice made unlawful under the Act. The plaintiff must establish by a preponderance of the credible evidence that plaintiff's discharge resulted from racial prejudice or plaintiff's legitimate civil rights activities. See Green v. McDonnell-Douglas Corp., supra. From the record, even if the burden of proof were on defendant, plaintiff would not prevail. Defendant's reasons for discharging plaintiff were instituted solely by plaintiff's unsatisfactory conduct as an employee. This conduct justified the discharge.
Plaintiff does not dispute the fact that he committed several of the acts for which he was disciplined. Plaintiff testified that on April 20th he did say to Mr. Faller, Mr. Hansen and Mr. Voss that they were being "Jackoffs". Plaintiff testified that on May 11th he intentionally walked into the restricted area. And, plaintiff admitted that on December 4th he was told to work on the mechanical trim line but refused to do so.
There is conflicting testimony as to whether plaintiff actually committed the acts of which he was accused on the other occasions when he was disciplined. Nevertheless, the facts which were apparent to management would justify the discipline which plaintiff received. On March 8th, plaintiff drove a car into the pit. The fact that there were black wheel marks in the area where plaintiff started the car and the fact that the steering mechanism was not faulty, as plaintiff claimed, would indicate that plaintiff was at fault. The management had just cause to give plaintiff a reprimand.
On April 20th, plaintiff drove a car on the roll test for a long enough time to put eleven miles on the speedometer, thus necessitating its replacement. When plaintiff was asked by his supervisor if there were any problems, plaintiff replied that there were not. These circumstances would justify disciplinary action.
On May 2nd, a security patrolman reported he saw plaintiff deliberately maintaining a fire in the carburetor of a car. Considering the previous sabotage that had occurred in that area of the plant, the defendant certainly had justification for giving credence to the report and for disciplining plaintiff. On May 31st, the credible testimony demonstrates that plaintiff was not doing his job properly. Once again, the discipline was justified.
Plaintiff also contends that he was discriminated against because of the manner in which defendant conducted its investigation into the origin of the racially derogatory signs that appeared on April 19th. The investigation was of short duration and not intensive. If the appearance of similar signs was a repeated occurrence such an investigation would be inadequate. However, in view of the circumstances of the situation, the court cannot find that the investigation was not handled in a proper manner. An intense investigation would have highlighted the incident and could have served to increase racial tension within the plant. The limited scope of the investigation was sufficient to indicate defendant's condemnation of such activity. *1215 The adequacy of the investigation is demonstrated by the fact that no more incidents of this type occurred.
Plaintiff further claims that his transfer from the road and roll test to the mechanical trim test was discriminatory. The fact that Mr. Robinson, a white repairman, was also transferred out of the road and roll test area following the incidents of sabotage, disposes of this contention.
The court is convinced that racially abusive language was directed toward plaintiff on two occasions on April 20th. Both incidents occurred during heated discussions with plaintiff. Though the court considers the use of such language deplorable, there is no indication that the emotions that precipitated these derogatory comments affected the actions of management, either before or after these insults were made.
The primary contention of plaintiff is that management was disturbed because plaintiff was filing grievances charging racial discrimination, and in order to eliminate such charges plaintiff was subjected to a series of disciplinary layoffs that resulted in his discharge. Plaintiff and Mr. Roberds testified that Mr. Hansen told them that this was the course of action management would employ to eliminate such charges. The court finds the credible testimony to be that of Mr. Hansen. Mr. Hansen testified he stated that unless plaintiff did not perform his job in a manner that was satisfactory to management it could only result in further disciplinary action. The meeting between Mr. Hansen and plaintiff was called because of the improper performance of his job. Two days previously, plaintiff had attended another meeting with members of management. The purpose of that meeting was to discuss plaintiff's poor work performance. Plaintiff testified that after March 8th he was very critical of borderline defects and that the production line was backing up as a result. This background of the meeting with Mr. Hansen convinces the court that the concern of management, including Mr. Hansen, dealt with plaintiff's work performance and not his charges of racial discrimination. Plaintiff, himself, was the person who interjected the topic of discrimination into the meeting with Mr. Hansen.
The court is convinced that management was not attempting to harass plaintiff by giving him disciplinary layoffs. Plaintiff could have received disciplinary action on March 31st for talking to an employee outside of his work area while units were waiting to be tested. Plaintiff could also have received a disciplinary action on April 14th for leaving the plant early. The fact that no disciplinary action occurred on these occasions actually indicates some degree of leniency on the part of management towards plaintiff.
The Court is also convinced that management was not giving plaintiff disciplinary layoffs in order to provide themselves with an opportunity to discharge plaintiff. If the intent of management was to discharge plaintiff, it could have done so previous to the time when plaintiff was actually discharged. At the Chevrolet plant, while the assessment of discipline depends upon the severity and nature of an act, there is a normal progression in the severity of disciplinary actions. This progression starts with a reprimand, continues through disciplinary layoffs of increasing duration, and culminates with a discharge. However, there are some violations of shop rules for which management has the right to discharge an employee regardless of his past history. Management is not bound to follow any particular pattern, but can assess any penalty provided in the shop rules. The penalties provided in all of the shop rules which plaintiff violated included the penalty of discharge.
The court finds from the evidence that plaintiff failed to show that defendant either discharged plaintiff because of his race or because of his complaints against defendant's alleged discriminatory practices. In fact, he has shown no discrimination against him. Plaintiff has shown no violation of 42 U.S.C.A. §§ 2000e-2(a) or 2000e-3(a).