**Frances Joy CAPERS et al., each Individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**LONG ISLAND RAILROAD et al., Defendants.**

**No. 72 Civ. 3168.**

United States District Court, S. D. New York.

April 13, 1977.

White & Case, New York City, for plaintiffs; Thomas McGanney, Richard J. Holwell, Todd B. Sollis, Ronald M. Hershkowitz, Robin Colin-Greene, New York City, of counsel.

George M. Onken, Jamaica, N. Y. for defendant The Long Island Rail Road Co., Jamaica Station; Richard H. Stokes, Laurence H. Rubin, Armand J. Prisco, Jamaica, N. Y., of counsel.

## OPINION

GAGLIARDI, District Judge.

Plaintiff Edward E. Harris ("Harris"), as a named plaintiff in the above action and a member of the class of black employees of the Long Island Railroad ("LIRR"), moves by order to show cause for a temporary restraining order and a preliminary injunction directing the defendant LIRR to reinstate him to his former position of Assistant Station Master ("ASM") and restraining the LIRR from future violations of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Harris also moves for back pay and reasonable counsel fees. This court has jurisdiction under 42 U.S.C. § 2000e–5(f)(3).

Harris alleges that he is entitled to the requested relief under 42 U.S.C. § 2000e–5(g)[1] because his demotion from the posi-

---

1. 42 U.S.C. § 2000e–5(g) provides in relevant part:

 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. . . . No order of the court shall require the . . . hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual . . . was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

tion of ASM was the result of race discrimination, 42 U.S.C. § 2000e–2(a),[2] and/or retaliation for his participation in this lawsuit. 42 U.S.C. § 2000e–3(a).[3] Harris also alleges that he has been deprived of his Fourteenth Amendment due process rights because the LIRR did not grant him a hearing in connection with his demotion. The LIRR contends that Harris was lawfully dismissed for poor performance, insubordination and his past employment record and is therefore not entitled to the requested relief. The court denies plaintiff injunctive relief.

Plaintiff's motion having been brought before this court on November 19, 1976, the motion was set for hearing the following day and the TRO application denied. The LIRR was prepared to commence the hearing the next day, however, at plaintiff's request the hearing was postponed to allow plaintiff further discovery. Six days of evidentiary hearings were held in December, 1976 and January, 1977. Sixteen witnesses were called and numerous depositions and exhibits were introduced into evidence. The court having considered the pleadings, the testimony of witnesses and the documents in evidence makes the following findings of fact and conclusions of law as required by Rule 52 Fed.R.Civ.P.

A brief summary of the history of Harris' employment with the LIRR including his involvement underlying the instant preliminary injunction action is initially required. Plaintiff is a black American citizen, 55 years of age. He was first employed by the Pennsylvania Railroad in 1954 as a mail handler. In 1963 he became an usher, the top union job at the Pennsylvania Railroad, and in 1964 he went on the Long Island Railroad's payroll. In 1972 he was appointed an ASM, a management level, non-union job.

On two prior occasions plaintiff has appeared before this court seeking injunctive relief for alleged LIRR discrimination. The first time, in September 1974, the LIRR attempted to demote the plaintiff from ASM to usher status on the ground that he had failed a Book of Rules examination. After a hearing, the matter was resolved when the LIRR agreed to restore Harris to the position of ASM if he passed another Book of Rules examination administered to a randomly selected group of ASMs. This examination was conducted and Harris, receiving the highest score of the seven ASMs who took the test, was immediately reinstated.

The second request for injunctive relief occurred in September 1975 when the LIRR removed Harris from service as an ASM for alleged insubordination and dereliction of duty when he argued with his superior and failed to have an usher announce a track change for a departing train. After a three day hearing in this court, the LIRR agreed to reinstate Harris to his ASM position after Harris agreed to accept a 60 day suspension.

At that 1975 hearing, the LIRR introduced evidence of Harris' prior unsatisfactory performance in his ASM position in 1974 and 1975. This evidence included five instances, not effectively rebutted by the plaintiff, where Harris was formally noti-

---

**2.** 42 U.S.C. § 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**3.** 42 U.S.C. § 2000e–3(a) provides in relevant part:

It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, . . . to discriminate against any individual, . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

fied or reprimanded for his failure to make proper log entries or reports or for his poor performance in connection with train delays.

On November 11, 1976, Harris was again removed from his ASM position. This removal is the cause of plaintiff's current motion for injunctive relief. Harris worked the 11:00 P.M. November 9th to 7:00 A.M. November 10th ASM shift at Pennsylvania Station. On that night shift the ASM is in overall charge of the LIRR operation at the railroad station. On that morning of November 10th the departure of four trains was delayed. Harris was demoted for his alleged responsibility for the delay, for failing to timely file a specially requested report of the November 10th incident, and for his past record.

On the morning of November 10th four LIRR trains were delayed directly or indirectly up to eleven minutes by the taking out of service of line 3 of Pennsylvania Station, the Long Island Railroad's eastbound tunnel. When line 3 is taken out of service, the departing Long Island Railroad trains must be rerouted by the ASM to share line 1, Amtrak's eastbound tunnel. Line 3 is removed from service several times a month, usually between midnight and 1:00 A.M., for regularly scheduled maintenance.

It is undisputed that on the night of November 9, 1976, Harris and other Long Island Railroad personnel knew that line 3 would be going out of service sometime after 11:00 P.M., and that Harris ascertained this fact at the time he reported for duty. The exact time line 3 closes is determined by the operator in Amtrak's A Tower and then communicated to other Amtrak and Long Island Railroad personnel. The ASM must ascertain the time line 3 is to close in order to position Long Island Railroad trains on their arrival so that they can use line 1 after line 3 is closed without changing crews and without unnecessary delay. That night A Tower determined that line 3 would close at 12:41 A.M. after the departure of Train 400 and prior to the departure of Train 82.

At the hearing there was sharply conflicting testimony as to the exact time Harris received notice of the closing. Notice is received over a squawk box in the ASM's office. Several defense witnesses testified that Harris had notification between 11:55 P.M. and 12:05 A.M., in sufficient advance notice for him to reposition the LIRR trains and avoid the subsequent delays, while Harris testified that he received no notice until 12:41 A.M., the exact time of the closing.

The court does not resolve this factual dispute but only notes that Harris had a duty to be more thorough in his investigation of the time of the line closing and more cautious and responsible in performing his ASM duties. Harris and all other LIRR and Amtrak employees on duty that night knew that line 3 was going out after 11:00 P.M. and based on recent past Penn Station history he had good reason to know that it was likely it would go out prior to or around the time of the departure of Train 82, requiring that train, and those following it, to be diverted to line 1.[4] He also knew that A Tower, which often conferred with ASMs on line closings, had often not been communicating with him over the past months.[5] Because of the important duties of the ASM between notification and closing of line 3, Harris, particularly in view of his communication problems, had the responsibility to continuously investigate and to ascertain the exact time of the closing. Even assuming as true Harris' disputed tes-

---

**4.** In the three months prior to November 9, 1976 line 3 was closed ten times for scheduled maintenance. At least eight of those times Train 82 had to be diverted to line 1 and five of those times the actual closing of line 3 occurred after the departure of Train 400 and before the departure of Train 82. Stretching back over a two year period Train 82 had to be diverted to line 1 for over one-third of the scheduled main-

tenance closings of line 3. Plft's supplementary memorandum and Pltf's Ex. 10.

**5.** Employees of A Tower and other Amtrak employees expressed, in their testimony or on taped conversations on the night of November 9th, that they had great difficulty working with Harris and that they avoided dealing with him and questioned his ability. Def's Exh. O, P.

timony that he was out of the office between 12:15 and 12:25 A.M. and could not hear the squawk box communications, it is not enough that he called the yardmaster twice between 11:45 and 12:15 to find out when line 3 was going out. Further, that absence at a crucial time is not sufficient excuse. Harris should have properly repositioned Train 82, and even if he was notified at 12:41 of the line 3 closing, he should have been alert to promptly reposition and avert or reduce the delays of the following trains. While others may have also been able to avert these delays, Harris had the final responsibility.

As a result of the delay of the four trains, the assistant superintendent of transportation for the LIRR on the morning of November 10th requested the terminal superintendent, Mr. Gaynor, to find the reason for the delay. Gaynor instructed an assistant to request Harris to provide a written report setting forth the facts of the delay. Harris was told when he reported to work at 11:00 P.M. on November 10th that Gaynor wanted the report by the end of Harris' shift the following morning.

Harris knew that Gaynor's request for a written report was a serious request and while such a written request was infrequently demanded it was in keeping with proper LIRR policy to find the reasons for delays and other operational failures. Harris was told by Gaynor's assistant that the station master's log book report, which Harris had already written, was insufficient and Harris knew he had to prepare a new and more complete written report. Harris did not write the report during his shift because he claimed he was too busy. While there were some active periods that night,

Harris could have written the report any time during his shift.

Failing to write the report during his shift and declining to stay late, Harris returned home. He called a supervisor at the LIRR and told him when he arrived home that morning that he had not completed the report. He received an extension and was told to bring the report with him that evening. Harris failed to write the report by that evening claiming that a dental emergency involving the replacing of an inlay prevented him from writing the report. However, he was only at the dentist's office between 5:00–6:00 P.M. He returned home by 7:00 P.M. and instead of writing the report went back to sleep, ate dinner and returned to work. When he reported to work at 11:00 P.M. Gaynor, who works the day shift, was in his office and requested the report and an explanation. Harris, failing to produce the report, was told to exercise his seniority rights.[6]

### Title VII Claim

■ Plaintiff moves for a preliminary injunction under Title VII claiming, as noted above, that he was demoted because of his race[7] or in retaliation for his involvement in this lawsuit.[8] As an individual class member to a Title VII suit, Harris is entitled to move for such preliminary relief. See Culpepper v. Reynolds Metals Co., 421 F.2d 888, 893–94 (5th Cir. 1970); Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969). The settled rule in this Circuit is that "a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits

6. Harris, when told to exercise his seniority rights, was being told that he was being removed from his management position and should return to his union job as an usher with the seniority rights he had as a union employee.

7. See, e. g., Garrett v. Mobil Oil Corp., 531 F.2d 892, 895–96 (8th Cir. 1976); Potter v. Goodwill Industries, 518 F.2d 864, 865 (6th Cir. 1975); Franklin v. Crosby Type Co. & Int'l. Typo. Union, 411 F.Supp. 1167, 1171–72 (N.D.Tex.

1976); Christian v. General Motors Corp., 341 F.Supp. 1207 (E.D.Mo.1972), aff'd. without opinion, 475 F.2d 1407 (8th Cir. 1973).

8. See, e. g., Gillin v. Federal Paper Board Co., Inc., 479 F.2d 97, 100–01 (2d Cir. 1973); Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969); EEOC v. Kallir, Philips, Ross, Inc., 401 F.Supp. 66 (S.D.N.Y.1975); McFadden v. Baltimore Steamship Trade Ass'n., 352 F.Supp. 403, 411 (D.Md.1973).

to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir. 1974), *quoting Sonesta Int'l. Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). This court holds that plaintiff, having failed to show either "probable success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation" for either of his claims, is not entitled to injunctive relief.[9] *Cf. Gresham v. Chambers, supra* at 691.

■ In evaluating plaintiff's claim, it is important for the court to note that an employer may discharge an employee for any reason except discrimination or retaliation against the employee's protected Title VII activities. *See Christian v. General Motors Corp.*, 341 F.Supp. 1207, 1214 (E.D. Mo.1972), *aff'd without opinion*, 475 F.2d 1407 (8th Cir. 1973); *Barnes v. Lerner Shops of Texas, Inc.*, 323 F.Supp. 617, 622 (S.D.Tex.1971). Title VII does not require that an employer like his employees. "No federal statute prohibits discrimination per se; rather, what is prohibited is discrimination that is racially motivated." *Richardson v. Hotel Corp. of America*, 332 F.Supp. 519, 521 (E.D.La.1971), *aff'd*, 468 F.2d 951 (5th Cir. 1972); *accord, Bradington v. International Business Machines Corp.*, 360 F.Supp. 845, 854 (D.Md.1973), *aff'd*, 492 F.2d 1240 (4th Cir. 1974).

■ In weighing the evidence in this case, this court takes notice of the Supreme Court decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), where the Court allocated the burden of proving the facts necessary to establish liability in Title VII actions.[10] Initially, the plaintiff must carry the burden of establishing a *prima facie* case of racial discrimination. The burden of going forward with the evidence then shifts to the defendant to show a nondiscriminatory reason for the employee's demotion. Plaintiff is then afforded an opportunity to show that defendant's asserted reason is a mere pretext. *Id.; see Garrett v. Mobil Oil Corp.*, 531 F.2d 892, 895 (8th Cir. 1976); *Franklin v. Crosby Type Co. Int'l. Typo. Union*, 411 F.Supp. 1167, 1171–72 (N.D.Tex.1976). In this case these same burdens would apply for a showing of "probable success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation" in order to meet the standard for a preliminary injunction.

■ The court finds that plaintiff proved a *prima facie* case. Harris belongs to a racial minority, he held a job with the LIRR and according to his testimony he performed his work within the normal qualifications required. He further testified that he was removed from his ASM position without legal cause. *See McDonnell Douglas v. Green, supra*, 411 U.S. at 802, 93 S.Ct. 1817; *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (6th Cir. 1975); *Franklin v. Crosby Type Co. & Int'l. Typo. Union, supra* at 1171.

■ However, the court finds, when the burden is shifted to the defendant, upon the entire evidence including the demeanor of witnesses who testified at the hearing, that the LIRR removed Harris for valid, nondiscriminatory reasons and has therefore sustained its burden. A combination of three factors justifies the LIRR's demotion of Harris. First, and most critically, was Harris' insubordinate failure to supply the ur-

---

9. This court recognizes that while the posture of this case is a motion for a preliminary injunction in the context of the class action suit, the six day hearing closely approximated a full hearing on the merits of Harris' individual claim respecting his demotion. As such the court is able to assess the likelihood of success on the merits and questions that are fair ground for litigation with the view that as to this specific claim little additional evidence would be available. *Cf. Pettway v. American*

*Cast Iron Pipe Co.*, 411 F.2d 998, 1003 (5th Cir. 1969).

10. Although expressed in the context of a non-class action proceeding, the analysis of *McDonnell Douglas v. Green, supra* would appear fully applicable to Harris' claim for injunctive relief, in that Harris' action relates solely to the individual circumstances surrounding his own demotion. *See Predmore v. Allen*, 407 F.Supp. 1067, 1070 n. 5 (D.Md.1976).

gently requested report explaining the train delays of the morning of November 10, 1976. The LIRR had a clearly legitimate interest in requesting the report to find the cause for the delays. Harris understood the serious urgency of the request, and he had an opportunity both during his shift on November 10–11 and during the day of November 11 to prepare the report and elected not to do so. This factor combined with his activities as ASM on the night of the train delays constitute sufficient insubordination and poor performance to justify his removal. During his shift he had a responsibility and a duty to find out when line 3 was going out and to plan accordingly. Without deciding whether he was directly responsible for the delays that night, this court concludes that Harris was negligent in his ASM duties. Additionally, Harris' past conduct as an ASM including the reprimands and notices of his poor performances in 1974 and 1975 and the activities and evidence of insubordination surrounding his 60 day suspension in 1975 must be considered in upholding his present removal. In view of all these factors and circumstances, the LIRR's decision to order Harris to exercise his seniority was a racially neutral, fair and justifiable personnel decision. *See Garrett v. Mobil Oil Corp.*, 395 F.Supp. 117, 125 (W.D.Mo.1975), *aff'd*, 531 F.2d 892 (8th Cir. 1976), and cases there cited.

■ After proof that the plaintiff's discharge was for cause, the burden of persuasion returns to the plaintiff to show that the defendant's stated reason for discharge was in fact a pretext for discrimination prohibited by Title VII. *McDonnell Douglas v. Green, supra*, 411 U.S. at 804, 93 S.Ct. 1817. Plaintiff has failed to meet this burden. Plaintiff has failed to prove any racial or retaliatory motive on the part of the LIRR. Proof of a statistical imbalance in the LIRR's management hiring is alone not enough to show such a pretext.

This court recognizes that an employer can remove and refuse to reinstate an employee only if the criterion applied is applied alike to members of all races. *McDonnell Douglas v. Green, supra* at 804.

However, plaintiff failed to establish evidence of disparate treatment in his case sufficient to meet his burden of establishing such a pretext. The LIRR introduced evidence of twenty white management employees who were dismissed or told to exercise their seniority rights between 1971 and 1975. Ten of these employees were removed specifically for insubordination in their refusal to cross a union picket line during a lengthy LIRR strike in 1972. The others were removed for a variety of reasons including poor performance, lackadaisical handling of assignments, failing to report train delays and a combination of these reasons. The LIRR also introduced evidence of other white management employees similarly removed from service since 1975. While the plaintiff introduced evidence of white management employees who received lesser discipline for different infractions, in view of the LIRR's overall disciplinary policy, this court cannot find that plaintiff has met his burden of showing that his punishment for his particular conduct was more severe than that of other white management employees or that the removal of other white management employees was for conduct more egregious than Harris' conduct leading to his removal. Plaintiff's overall employment record and the conduct that triggered his November 11th dismissal gave the LIRR good, nondiscriminatory grounds to remove him with no indication that a white management employee would have received different discipline. Therefore, this court does not find that plaintiff has presented the necessary evidence of disparate treatment under the circumstances of Harris' removal to meet his burden and to be entitled to injunctive relief.

In sum, on the record here there is no evidence to support plaintiff's conclusory assertion that he was dismissed because of his race or in retaliation for his activities in the Title VII class action suit. While plaintiff has made out a *prima facie* case, defendant has met its burden of showing nondiscriminatory reasons for the removal and these reasons were not pretextual. Rather, evidence in this case establishes that plain-

tiff was removed from his ASM position by the LIRR solely because of plaintiff's unsatisfactory conduct as an employee and that factors of race or status as a plaintiff in the class action lawsuit had no bearing on the LIRR's actions. Plaintiff has shown no violation of 42 U.S.C. §§ 2000e–2(a) or 2000e–3(a) and has not met either of the alternative criterion for a preliminary injunction under *Sonesta Int'l Hotels Corp. v. Wellington Assoc., supra.* He is therefore not entitled to injunctive relief under 42 U.S.C. § 2000e–5(g).

### Due Process Claim

■ Plaintiff contends that his demotion from the position of Assistant Station Manager without a hearing is in violation of his rights under the Due Process Clause of the Fourteenth Amendment. The court finds the plaintiff's argument unpersuasive and holds that the LIRR, even assuming it is acting under color of state law,[11] was not required to give plaintiff a due process hearing under the Fourteenth Amendment.

At the threshold, successful assertion of any due process claims turns on whether Harris' interests in retaining his ASM position rise to the level of those encompassed by the Fourteenth Amendment's protection of "property" or "liberty". The Supreme Court decisions in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) provide that when either a deprivation of a property interest, such as a termination of an employment contract, or a deprivation of liberty, such as an employment record that operates to absolutely

foreclose other employment opportunities, result from the decision to discharge an employee, due process requires that notice of the charges and a hearing must be granted to the employee. *See Velger v. Cawley,* 525 F.2d 334, 336 (2d Cir. 1975), *rev'd on other grounds sub nom., Codd v. Velger,* —— U.S. ——, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Simard v. Board of Education of Town of Groton,* 473 F.2d 988, 992 (2d Cir. 1973).

### Plaintiff's Property Interest in His Employment

■ The Supreme Court in *Board of Regents v. Roth, supra,* and *Perry v. Sindermann, supra,* defined those "property" interests that require procedural due process protections. Such "property" interests include contractual or statutory rights to continued employment as well as rights acquired under a "*de facto* tenure program" resulting from "the existence of rules and understandings, promulgated and fostered by state officials, that may justify [a] legitimate claim of entitlement to continued employment . . . ." *Perry v. Sindermann, supra,* 408 U.S. at 600, 602, 92 S.Ct. at 2700; *see Russell v. Hodges,* 470 F.2d 212, 216 (2d Cir. 1972). However, a mere "unilateral expectation" of continued employment is not sufficient "property" to trigger due process guarantees. *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. 2701; *see Wahba v. New York University,* 492 F.2d 96, 98 n. 2 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

■ In this case, plaintiff has not shown any "property" interest in continued em-

11. Although not necessary to the court's determination, it appears that the LIRR as a "subsidiary corporation" of the Metropolitan Transportation Authority (MTA) since 1966, is acting under color of state law and is bound by the requirements of the Fourteenth Amendment. *See Quintero v. Long Island Railroad,* 55 Misc.2d 813, 286 N.Y.S.2d 748 (S.Ct. Kings Co. 1968); *see also Taylor v. New York City Transit Authority,* 433 F.2d 665 (2d Cir. 1970); *Kissinger v. New York City Transit Authority,* 274 F.Supp. 438, 441 (S.D.N.Y.1967). The MTA is a "public benefit corporation" created by the

State of New York in 1965. Title 11, Public Authorities Law §§ 1263 and 1266 (McKinney 1970). The LIRR as a subsidiary corporation entirely owned and operated by the MTA, enjoys the "privileges, immunities, tax-exemptions and other exemptions" of the MTA and is "subject to the restrictions and limitations to which the authority may be subject." Public Authorities Law § 1266(5). Under the circumstances, the LIRR is acting under color of state law. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

ployment. Plaintiff, as an appointed, non-represented, management employee of the LIRR, has alleged no contractual or statutory claim to continued employment. Furthermore, Harris, although he was a "permanent" ASM and had worked as an ASM for five years, was not entitled to tenure protection and alleged nothing to show *de facto* tenure. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Russell v. Hodges, supra* at 217.

Harris had at most a "unilateral expectation" of continued employment, as there existed no well-established joint understanding as required for a "*de facto* tenure program." *Simard v. Board of Education of Town of Groton,* 473 F.2d 988, 992 (2d Cir. 1973). Harris knew that when he was promoted from a union position to a management position that the LIRR was making no promises about his continued employment. The LIRR had in the past dismissed or disciplined a significant number of management employees including Harris who had accepted a sixty day suspension in 1975.[12] As such, there could be no mutual expectation of continued employment sufficient to establish a "property" interest deserving of the protection of due process.

### Plaintiff's Claim of a Deprivation of Liberty

In order to demonstrate a deprivation of "liberty", Harris must demonstrate that the reasons given for his demotion "might seriously damage his standing and associations in his community" or had imposed "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707; *see Wahba v. New York University, supra,* 492 F.2d at 98 n. 2; *Simard v. Board of Education, supra,* 473 F.2d at 992; *Russell v. Hodges, supra,* 470 F.2d at 216. The Court made clear that by the latter phrase it meant something more than the inevitable disadvantage when a person

"simply is not rehired in one job but remains as free as before to seek another." *Board of Regents v. Roth, supra,* 408 U.S. at 575, 92 S.Ct. at 2708; *see Russell v. Hodges, supra* at 216; *Haron v. Board of Education of City of New York,* 411 F.Supp. 68, 73 (E.D.N.Y.1976). "Mere proof, for example, that his record of non-retention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Board of Regents v. Roth, supra,* 408 U.S. at 574 n. 13, 92 S.Ct. at 2708.

The Supreme Court in *Board of Regents v. Roth, supra* at 573, 92 S.Ct. 2701, stated that a charge of dishonesty or immorality could implicate an individual's "liberty" interest. In this case Harris by being charged with poor performance and insubordination has not been deprived of his "liberty" within the meaning of *Board of Regents v. Roth.* There is no suggestion, as required to invoke due process protection, that Harris' "good name, reputation, honor, or integrity is at stake because of what the [LIRR] is doing to him . . . ." *Id.* at 573, 92 S.Ct. at 2707, *quoting Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *see Bishop v. Wood, supra,* 426 U.S. at 347–348, 96 S.Ct. at 2079–80. The Supreme Court's notion of liberty in *Board of Regents v. Roth* distinguishes between a stigma of moral turpitude, which infringes the liberty interest, and a charge of incompetence or inability to get along with co-workers which does not. *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 365–66 (9th Cir. 1976); *Jablon v. Trustees of California State Colleges,* 482 F.2d 997, 1000 (9th Cir. 1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). In this case Harris' demotion for failing to adequately perform his duties as an ASM and failing to provide an urgently requested report falls into the latter category. The Ninth Circuit, in a case more egre-

12. In each case, these disciplinary procedures were without a due process hearing of any kind.

gious then the case at bar, found that charges of "insubordination, incompetence, hostility toward authority, and aggressive behavior . . . do not import serious character defects such as dishonesty or immorality" and do not warrant a hearing, as contemplated by *Board of Regents v. Roth. Gray v. Union County Intermediate Education District,* 520 F.2d 803, 806 (9th Cir. 1975).

The LIRR in demoting Harris did not attack his honesty or integrity. The fact that his demotion and the reasons for it may have a deleterious effect upon his future employment prospects is unfortunate but the Supreme Court in *Board of Regents v. Roth, supra,* 408 U.S. at 574 n. 13, 92 S.Ct. 2701, specifically noted that this "kind of foreclosure of opportunities" does not give rise to a right to a hearing. *See Jablon v. Trustees of California State Colleges, supra,* 482 F.2d at 1000; *cf. Bishop v. Wood, supra,* 426 U.S. at 347–348, 96 S.Ct. at 2079–2080.

 Even if the "liberty" interests of Harris were infringed, this court's post demotion hearing satisfies due process requirements. Five days after Harris was dismissed from his ASM job he moved in this court for an order to show cause and for a temporary restraining order to be reinstated in his ASM position. The court offered to commence the hearing the following day and because of plaintiff's unwillingness to proceed denied the temporary restraining order. The eventual hearing, after extensive depositions, lasted six days and Harris, represented by counsel, was accorded full due process. If a stigma had attached because of his demotion, his entitlement under the Due Process Clause to a hearing to confront the allegations and refute the charges against him was satisfied by the hearing before this court. *See Codd v. Velger,* —— U.S. ——, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The Supreme Court in *Arnett v. Kennedy,* 416 U.S 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974), in referring to a hearing where liberty interests are at stake stated, "[s]ince the purpose of the hearing in such a case is to provide the person 'an opportunity to clear his name', a hearing afforded . . . after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause". *See Codd v. Velger, supra* —— U.S. at —— – ——, 97 S.Ct. 882; *Morgan v. Fletcher,* 518 F.2d 236, 241 (5th Cir. 1975). Furthermore, in this case the court has found no evidence of dishonesty or immorality on the part of plaintiff so that even if he were accused of an act of moral turpitude, which the court does not find, the post-demotion hearing before this court has removed any wrongful stigma from plaintiff's reputation and satisfies due process requirements.

*Conclusion*

The court has found that plaintiff was removed from his ASM position solely for his insubordination, poor performance and his past employment record. The action of the LIRR on November 11, 1976 in ordering Harris to exercise his seniority rights was not the result of discrimination on account of his race or in retaliation for his participation in the class action suit. While this court, were it in the position of the LIRR, may not have under the circumstances removed an individual with Harris' ability, this was an employment decision for the LIRR to make and, absent proof of discrimination, this court cannot interfere with it.

The court has further found that plaintiff was not deprived of his Fourteenth Amendment due process rights because of the LIRR's failure to grant him a hearing. Therefore, plaintiff's motion for a preliminary injunction is denied in all respects.

So Ordered.