Morris W. FRANKLIN

v.

**CROSBY TYPESETTING COMPANY
AND INTERNATIONAL TYPO-
GRAPHICAL UNION.**

Civ. A. No. CA 4–74–240.

United States District Court,
N. D. Texas,
Fort Worth Division.

Jan. 23, 1976.

Huey P. Mitchell, Fort Worth, Tex., for plaintiff.

William O. Callaway, Jr., Fort Worth, Tex., Edward B. Cloutman, III, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

MAHON, District Judge.

This is a suit in which Plaintiff Morris W. Franklin, a black citizen of the United States and resident of Tarrant County, Texas, is suing his former employer and union for back pay, punitive damages, attorney's fees, and injunctive relief. Franklin contends that he was denied twelve months experience credit as an apprentice printer, that he lost wages because the twelve month experience credit was denied, that he was discharged, and that the local union refused to represent him. He alleges that all of these things occurred solely because of his race. Crosby Typesetting Company, Inc. contends that it discharged Franklin for cause. The union contends that it did adequately represent Franklin but that it was unable to help him because he failed to give notice of his grievance within seventy-two hours of the act complained of as required by the employment contract. The case was tried before the Court on December 9, 10, and 15, 1975, and based on the evidence produced at trial the Court makes the following findings of fact and conclusions of law.

Morris W. Franklin, a Negro, was hired by Crosby Typesetting Company on March 29, 1967, as a deliveryman. His duties consisted of delivering proofs, wrapping prints, and performing various jobs in the shop. In 1968, Ted Wilkenson, owner and president of Crosby Typesetting, suggested that Franklin apply for union membership as an apprentice printer. Franklin agreed and Wilkenson recommended him to the union.[1] On May 5, 1968, Morris W. Franklin was initiated into International Typographical Union, Local 198. There was no discussion at the union meeting that Franklin be accorded any experience credit for his job as deliveryman, but Wilkenson did tell him that he would be compensated at a rate sufficient to prevent a reduction in pay from the wages he received as a deliveryman.

Franklin worked as an apprentice from May 5, 1968, until December 31, 1970. In his first two years as an apprentice Morris Franklin was a model employee. During this period he made excellent grades on his apprentice lessons, he apparently had no complaints regarding his employment situation, and his fellow employees had no complaints about him or his work.

Following a reduction in his overtime hours in April 1970 and consequently a reduction in his pay, Franklin inquired

---

1. The evidence of both Franklin and Wilkenson indicated that Wilkenson took a personal interest in Franklin, he liked him and wanted to see him advance in the printing trade. It was Wilkenson's encouragement which prompted Franklin to become an apprentice printer.

about his rate of pay in May 1970.[2] The company told him his hourly rate of pay and that it was in conformity with the contractual provisions for an apprentice with his experience. The plaintiff did not complain to either the company or the union that he had not received all the experience credit to which he claimed he was entitled.

Approximately six months prior to the Plaintiff's discharge, his fellow employees began to complain about the manner in which he cleaned type. The method objected to involved banging type against either a metal or stone counter in an attempt to remove burrs.[3] The testimony of every witness except the Plaintiff revealed that slamming the type created a loud and startling noise. Further, this startling noise was both disruptive to work and produced a risk of harm to various machine and saw operators in the vicinity of the Plaintiff's work.[4] Various employees complained of the noise and on four separate occasions the danger was explained to the Plaintiff and he was warned to discontinue slamming the type.[5] Paul Markgraft, the assistant foreman, testified that after each warning the Plaintiff discontinued his excessive banging of the type for a period of time. The Plaintiff testified that he was warned not to slam the type on several occasions, but he denies he cleaned the type any differently from the other employees.

In the fall of 1970 Mr. Richard L. Clayton was appointed Chairman of the Apprentice Committee of Local 198. Mr. Clayton visited each chapel in the local union and attempted to talk to every member including apprentices. Clayton testified that the Plaintiff had no complaints of any problem regarding his job situation. Clayton did warn Franklin, however, that there had been several complaints regarding his loud slamming of type. The Plaintiff responded to this warning by stating that he would try to watch the noise.

In mid-December 1970 the Plaintiff was again warned by both the president and the foreman of the company that there were complaints regarding his continued slamming of type. Mr. Wilkenson discussed the situation privately with the Plaintiff, and determined that the disruptions were intentional. On December 31, 1970, the Plaintiff again slammed his type in a loud disruptive manner. Mr. Paul Markgraft, the assistant foreman, witnessed the disturbance and fired the Plaintiff pursuant to direct authority given him by the foreman. Mr. Wilkenson appeared immediately at the scene of the firing and upon learning the facts confirmed that Franklin was fired and directed him to draw his time.

On January 13, 1971, the Plaintiff filed a claim for unemployment benefits with the Texas Employment Commission. His application admits his practice of slamming type and his failure to discontinue that practice after being warned.[6] The claim for unemployment

2. Franklin's overtime was eliminated after other union members complained that he was allowed to work overtime to the exclusion of the other union members.

3. The testimony is clear that it was necessary to clean the type after a job was made up to remove burrs or small pieces of lead. If the burrs were not removed the clarity and spacing in the final product were adversely affected. The testimony was also clear, however, that it was unnecessary to throw or slam the type against the counter. The type was sufficiently cleaned by merely tapping it against the counter.

4. The testimony indicated that the startling noise could easily have caused the operators of the high speed saws to lose their fingers. The sound also interrupted the operators of the linograph machines who believed the noise to be a machine malfunction which could cause hot lead to be spued on the operator.

5. The warnings were made by the president, the foreman, the assistant foreman, and the union chapel chairman.

6. The claim for benefits, defendants' exhibit 3, also admits that the practice was annoying to the other workers. Further, this exhibit provides insight into the credibility of the plaintiff and this is most important where, as here, there is conflicting testimony. The Plaintiff's statements in the claim adversely affected his chances of recovery in this suit. These state-

benefits was opposed by the company on the basis that the discharge was for misconduct. The Commission found the discharge was for cause and denied the Plaintiff's claim. The Plaintiff appealed the decision and after a complete administrative hearing conducted before the Texas Employment Commission Appeal Tribunal, the Plaintiff was found to have been discharged for misconduct and he was disqualified from receiving unemployment benefits for six weeks. The Appeals Tribunal decision was affirmed on appeal by the Texas Employment Commission on March 16, 1971.

The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on February 6, 1971. Franklin's complaint alleged that he was denied twelve months credit and discharged from his employment because of the concerted racial discrimination of both the union and the company.

On February 12, 1971, Franklin contacted the Secretary-Treasurer of Local 198 and told him of his discharge. The Secretary-Treasurer referred the Plaintiff to Charles Renfro. Subsequently, the Plaintiff contacted Charles Renfro, president of Local 198, and complained of his discharge and rate of compensation. Renfro explained to the Plaintiff that he was untimely in his complaint but that he would do whatever possible under the circumstances to obtain reinstatement or back wages. Renfro met with the company but they refused to either reinstate the Plaintiff or pay him any amount of alleged back wages. Renfro reported these results to Franklin and stated that there was nothing more the union could do. Franklin then contacted the International Union by letter on two occasions. Subsequent to each letter, the local union met with Franklin, and at the second meeting in May 1971 the Executive Council again informed the Plaintiff that he was untimely in complaining of his discharge and that there was nothing the union could do.

In March 1971, Jerry Mendez, a member of the Apprenticeship Committee, contacted the Plaintiff and was informed that he no longer sought to be employed in the printing industry. In July 1971, the Plaintiff was refunded the dues he paid from January through June 1971. He was told that he would be continued on the job list and referred out at the first opportunity. The records reflect that the Plaintiff was suspended from the union on January 10, 1971. The testimony indicated that suspension meant that the individual was still a member in good standing of the union, but that he was not presently employed in a printing position and it was unnecessary for him to pay dues until he was so employed.

■ The Plaintiff bases his claim of jurisdiction over the defendants on three statutes. First, he contends jurisdiction is founded on 42 U.S.C. Section 1981. The Defendants contend that any claim based on 42 U.S.C. Section 1981 is barred by the Texas statute of limitations. The Court agrees. The action complained of in this suit occurred on December 31, 1970, and the suit was filed on September 13, 1974. The Supreme Court stated in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), that an action brought under 42 U.S.C. Section 1981 must be filed within the applicable limitation period provided by state law and that the filing of a Title VII charge did not toll that limitation period. The Fifth Circuit Court of Appeals has held that the applicable Texas statute in Section 1981 actions is Tex.Rev.Civ.Stat. Ann. art. 5526 which provides for a two year limitation period. *Johnson v. Goodyear Tire and Rubber Co.*, 491 F.2d 1364, 1378–79 (5th Cir. 1974); *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 647–48 (5th Cir. 1974). The Plaintiff's suit was filed more than two years after his discharge and his claim under 42 U.S.C. § 1981 is therefore barred.

ments were obviously initialed by the Plaintiff, and yet at trial he denied under oath he had made the statements or placed his initials on the statements. The Court finds that this seriously affects the credibility of Mr. Franklin.

The Plaintiff also contends that this Court has jurisdiction based on 42 U.S.C. § 2000e et seq. The Court finds that jurisdiction is proper under that statute.

■ A determination that Crosby Printing Co., Inc. discriminated against the Plaintiff in employment because of his race in violation of 42 U.S.C. Sections 2000e, *et seq.* is essentially a question of fact. *Bradington v. International Business Machines*, 360 F.Supp. 845 (D.Md. 1973), aff., 492 F.2d 1240 (4th Cir. 1974). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court allocated the burden of proving the facts necessary to establish liability in Title VII suits. Initially, the Plaintiff must carry the burden of establishing a *prima facie* case of racial discrimination. *Green, supra* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. The Court finds that the Plaintiff proved a *prima facie* case. The Plaintiff belongs to a racial minority, he held a job with the Defendant, and according to his testimony he performed his work within the normal qualifications required. He further testified that he was fired because he made too much noise when he slammed type on a metal counter and that Caucasian employees had used the same method to clean type but no action had been taken against them.

■ The burden of going forward with the evidence then shifted to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. The Court finds that the Defendant met this burden. Initially the Court was skeptical that an employee could disrupt a print shop by slamming type on a counter. Before hearing any evidence, the Court assumed that the noise level in a shop which operated several machines would be so high that any noise made by an individual would be indistinguishable. This apparently was not the case however. While the noise level in a print shop is obviously much higher than in a courtroom, the testimony revealed that the noise produced by slamming type was a loud, startling, noise which was easily distinguishable from the lower steady sounds made by the machines. Moreover, the testimony indicated that the printers quickly became accustomed to the humming of the machines, and that any unusual noises was interpreted as a machine malfunction. After listening to the noise being simulated in the Courtroom by several witnesses, the Court finds that the slamming of the type created an unexpected, loud, and startling noise easily distinguishable from the noise made by the machines. Further, the Court finds that slamming type on the counter not only disrupted work in the shop, but it also caused a risk of injury. When the Plaintiff slammed the type on the counter, the high speed saw operators were startled and exposed to the danger of losing their fingers on the saw. The operators of the linotype machine interpreted the noise as a machine malfunction and they often jumped away from their machines to avoid being burned by hot lead. Obviously, such action could result in injury to the machine operators. The evidence also indicates that the Plaintiff was the only individual who slammed type in this manner and that no other employee cleaned type in such a loud and disturbing manner. The Court therefore finds that the Defendants were justified in discharging the Plaintiff when he persisted in slamming type after he had been repeatedly warned of the danger. The number of warnings and the discussions surrounding those warnings indicating that the Plaintiff's actions were intentional, also justified the company in discharging the Plaintiff for insubordination.

The Court also finds meritless the Plaintiff's claim that he was denied twelve months experience credit because of his race.[7] Both the Plaintiff and Mr.

---

7. There is a conflict between the records of the International Union and those of both the local union and the company. The records of the International were taken from the local

Wilkenson testified that the Defendant was to pay the Plaintiff at a rate greater than the contract required for first year apprentices. The testimony indicated, however, that the reason for the higher pay was not to credit Plaintiff for his experience, but rather was to induce him to become an apprentice without reducing his income. The crux of a civil rights suit is that similarly situated people have been treated differently because of their race. In the time frame relevant to this suit only one Caucasian was admitted to the union chapel and received experience credit. While this Caucasian's job experience with the company was similar to the Plaintiff's, his admission to the union was immediately after graduation from a technical high school where he completed a four year study in printing. It is evident therefore that the Caucasian who received experience credit was not similarly situated to the Plaintiff whose only experience was as a deliveryman.

■ After proof that the Plaintiff's discharge was for cause, the burden of persuasion returned to the Plaintiff to show that the Defendant's stated reason for discharge was in fact a pretext for discrimination prohibited by Title VII. *Green, supra* at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 678. The Plaintiff totally failed to meet this burden.[8]

The Plaintiff's original complaint seeks to invoke the jurisdiction of this Court over the defendant union both on the basis of 42 U.S.C. § 2000e *et seq.* and 29 U.S.C. § 151 *et seq.*[9] It is undisputed that the union was not responsible for Franklin's discharge. Although there was some conflict in the testimony, the Court finds that the union had no say in the amount of experience credit to be given a new apprentice.[10] The only area in which the union could have discriminated against the Plaintiff was in their duty to represent his interest upon his discharge and regarding his rate of pay.

■■ The union's duty to adequately represent a member of the collective bargaining unit only requires that the union's conduct toward that member not be arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842, 857 (1967). The union's conduct in this case was not arbitrary, discriminatory, or in bad faith. The testimony produced at trial revealed only one other discharge case in this chapel. The evidence indicated that a Caucasian employee was fired and demanded written reasons for his discharge within seventy-two hours pursuant to the contract. The employee was then temporarily reinstated in accordance with the contract until a final determination was made on his grievance.[11] The Plaintiff's discharge is not

records. The mistake was apparently caused when the International noted that the Plaintiff was being paid at a rate higher than required for a first year apprentice. As previously stated, however, the higher rate was not for experience credit but was to permit the Plaintiff to become an apprentice printer without taking a reduction in pay. The mistake was on the books of the International Union and not those of the local union or the company.

8. The only evidence produced in rebuttal was by the Plaintiff. His testimony was essentially a restatement of his direct testimony and a denial of the testimony of the other witnesses. The Court finds his testimony unconvincing and subject to the same lack of credibility as noted in footnote 6.

9. These allegations are set forth in paragraph I of Plaintiff's Original Complaint. The only reference to actions of the union in the complaint are in Paragraph V and only allege a violation of 42 U.S.C. § 2000e *et seq.*

10. There was testimony by several union members that a union determination was necessary to award an apprentice credit for work experience. The Court finds, however, that, as Mr. Wilkenson testified, credit for experience was exclusively controlled by management. While the union might recommend credit be awarded, the recommendation was not binding on the company. The union did not discriminate against the Plaintiff by failing to recommend experience credit because he was not treated differently from any similarly situated apprentice. As previously stated the only apprentice to receive experience credit was one who had four years technical training as a printer. The Plaintiff had no such experience.

11. The final determination resulted in the employee's discharge with a company agreement not to blacklist him.

similar to that discharge, however, because he did not demand written reasons for his discharge within seventy-two hours pursuant to the contract. In fact, the Plaintiff's first notice to the union was not given until forty-three days after his discharge. The difference in treatment was not based on race but rather was based on the Plaintiff's failure to comply with the contract.

Although the Plaintiff admits that he did not contact the union until February 12, 1971, forty-three days after his discharge, he contends that Thomas Farris, the chapel chairman, learned of his discharge within seventy-two hours and Farris should have filed a grievance and required the Plaintiff's reinstatement on his own initiative. Alternatively the Plaintiff contends that there is no time limit under the contract for filing a grievance, and the union did not take sufficient action when it was notified of the Plaintiff's discharge on February 12, 1971.[12]

Defendant's Exhibit 10, the Union Contract, states in Article IV, Section 8 that "Demand for written reason for discharge shall be made within seventy-two hours after employe is informed of discharge." Reading the contract as a whole it is obvious that the demand for written reasons on discharge is the device used to trigger the grievance procedure. It puts the company on notice that its actions may be challenged, and gives notice to the union that one of its members is dissatisfied with an act of the company. If an employee is disgruntled with an action of the company, the only manner in which the union may learn of the dissatisfaction is for the employee to demand the written reasons for discharge from the company or complain directly to the union.[13] In the case at bar the Plaintiff admittedly not only failed to demand written reasons for his discharge from the company within seventy-two hours, but expressed no discontent to the union for a period of forty-three days.[14] The union's duty of fair representation does not include searching out every discharged employee and determining if he was satisfied with the company's action. It only requires that a union's conduct toward a member of the collective bargaining unit not be arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes, supra.* The union failure to file a grievance was not arbitrary but was based on the Plaintiff's failure to take timely steps to inform them of his discontent. The union's action was not discriminatory. The only other discharge case testified to at trial was factually distinguishable because of the Plaintiff's failure to comply with the contract. The union is not guilty of bad faith. The actions of Mr. Renfro in attempting to gain a voluntary reinstatement by the company after the Plaintiff had slept on his rights are evidence of the union's good faith in their treatment of Franklin.

The Court therefore finds and concludes that the company did not discriminate against the Plaintiff because of his race either in his discharge or in the denial of experience credit. The Court further finds that the union neither discriminated against the Plaintiff nor breached its duty of fair representation. The Court accordingly denies any recovery to the Plaintiff. Each party is to bear its own costs.

---

12. The Court notes that the notice to the union came six days after the Plaintiff charged them with discrimination. See Plaintiff's Exhibit 10.

13. A complaint to the union within seventy-two hours would not satisfy the contract, but the union could then inform the disgruntled union member to demand written reasons from the company.

14. It is interesting to the Court that the Plaintiff's notice of his dissatisfaction follows the company's successful opposition to his claim for unemployment benefits.