**Judith HAYDEN, Plaintiff,**

v.

**ATLANTA NEWSPAPERS, A DIVISION OF COX ENTERPRISES, INC., Defendant.**

**Civ. A. No. C81–149A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 26, 1982.

---

Kathryn M. Zickert of Johnson, Crosby, Workman & Zickert, Decatur, Ga., for plaintiff.

Donald B. Harden and John E. Donovan, Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

Plaintiff brings this suit against the Atlanta Newspapers (hereinafter "Company") under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging sex discrimination in employment practices. The action is currently before the court on the defendant's motion to dismiss, Rule 12(b)(6), Fed.R.Civ.P., and the defendant's motion for summary judgment, Rule 56, Fed.R.Civ.P.

### I. *Motion to Dismiss*

■ The defendant contends that the plaintiff's claim for compensatory damages should be dismissed because compensatory damages are not available under Title VII.

It is well established that the remedial provisions of Title VII provide only for equitable relief, including but not limited to, backpay and reinstatement. *See, e.g., Miller v. Texas State Board of Barber Examiners,* 615 F.2d 650 (5th Cir.), *cert. denied,* 449 U.S. 891, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980); *Pearson v. Western Electric Co.,* 542 F.2d 1150 (10th Cir. 1976); *Richerson v. Jones,* 551 F.2d 918 (3d Cir. 1977); *Howard v. Lockheed-Georgia Co.,* 372 F.Supp. 854 (N.D.Ga.1974). Accordingly, plaintiff's claim for compensatory damages fails under Title VII.

■ However, the plaintiff has also alleged a violation of 42 U.S.C. § 1981 and apparently seeks monetary relief for such violation. Although compensatory and punitive damages are available in a section 1981 action, *Cofield v. Atlanta,* 648 F.2d 986 (5th Cir. 1981), the plaintiff does not allege any discrimination cognizable under that section. Section 1981 proscribes race, and not sex, discrimination. *See, e.g., Balmes v. Board of Education of Cleveland City School District,* 436 F.Supp. 129 (N.D.Ohio 1977); *Jones v. United Gas Imp. Corp.,* 68 F.R.D. 1 (E.D.Pa.1975). Thus, the court will grant the defendant's motion to dismiss the plaintiff's claim for compensatory damages, and, in addition, will dismiss her section 1981 claim for failure to state a claim upon which relief can be granted.

### II. *Motion for Summary Judgment*

Defendant presents three arguments in support of its motion for summary judgment. First, the Company contends that Hayden has not made a prima facie showing that the Company's failure to select her for machinist training was based on her sex. Alternatively, the Company alleges that there was a legitimate, nondiscriminatory reason for Hayden's non-selection, and furthermore, that Hayden has not established pretext. Second, the Company argues that its termination of Hayden's salary continuation benefit was not discriminatory. Third, the Company asserts that the granting of summary judgment is warranted because Hayden's allegations of sexual harassment

do not constitute sex discrimination within the meaning of Title VII. We consider these arguments in sequence.

### A. *Machinist Training*

In May 1978 plaintiff Hayden was hired by the Company as a journeyman printer in the Composing Room. In early October 1979, the Company tentatively decided to create an additional machinist position in the Composing Room.[1] It asked the Atlanta Typographical Union No. 10 (hereinafter "Union"), plaintiff's collective bargaining representative, to poll the eligible journeymen to determine whether they were interested in the position and to prepare a list of those interested. Defendant's Brief in Support of Motion for Summary Judgment (hereinafter "Defendant's Brief"), Exh. 14, Affidavit of E. Sweat. Hayden and a number of other journeymen indicated an interest in the position.

During the week of October 15, 1979, the Company decided to fill the machinist position. *Id.* Accordingly, on October 17, 1979, the Union polled the journeymen who had previously expressed interest in the position to determine if they were still interested. Defendant's Response to Plaintiff's Reply to Defendant's Motion for Summary Judgment (hereinafter "Defendant's Reply Brief"), Affidavit of J. Green. Every journeyman who was contacted by the Union indicated that he was not. The Union then advised Robert Guthrie, Assistant Executive Foreman of the Composing Room, that none of the journeymen previously listed wanted to apply for the machinist position. Guthrie noted on the list: "All no as per Jack Green to Eddie Sweat. October 17, 1979." Next to Hayden's name, he marked "'off TF' ('til further notice)". Defendant's Brief, Exh. 14.

During the week that the second poll was taken, Hayden worked only one day, October 16, 1979. She was off on October 15, 17, 18, 19, 20 and 21, 1979 due to an injury, Plaintiff's Reply to Defendant's Brief in Support of Motion for Summary Judgment (hereinafter "Plaintiff's Brief"), Exh. 1, Attachment 7, and hence, was not questioned by the Union on October 17th. Apparently, the Union failed to subsequently contact Hayden. Defendant's Brief, Exh. 14. However, upon her return to work, Hayden spoke to Jack Green, Joday Browning, and Frances Bell, all of whom are union officials, about her interest in the machinist position. Deposition of J. Hayden at 405–06. A short time thereafter, Eddie Sweat, Foreman of the Composing Room, selected a male apprentice printer to fill the machinist position. Defendant's Brief, Exh. 14. Approximately three days before this apprentice began machinist's training, Bell asked Guthrie why Hayden had not been selected. Bell states that he responded by laughing "and said she [Hayden] was out sick too much and that he did not feel she could lift the heavy rollers and that the job was too dirty for her."[2] Plaintiff's Brief, Exh. 2.

---

**1.** "Machinist" is one of several employee classifications in the Composing Room. Machinists perform routine maintenance and repair mechanical and electrical equipment. Machinist positions are filled on the basis of seniority from among those journeymen printers who are interested in the job. Under the governing collective bargaining agreement between the Company and the Atlanta Typographical Union No. 10, machinists are paid the same rate that journeymen printers are paid. A journeyman printer who becomes a machinist is placed at the bottom of the machinist seniority list for purposes of scheduling. Defendant's Brief in Support of Motion for Summary Judgment (hereinafter "Defendant's Brief"), Exh. 14, Affidavit of E. Sweat. Selection for machinist training does not confer upon a journeyman

greater job security or protection from layoff. Defendant's Response to Plaintiff's Reply in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Defendant's Reply Brief"), Affidavit of J. Green. While the plaintiff claims that selection for the machinist position would have provided greater job security, Deposition of J. Hayden at 28, she does not adduce any facts which support this claim. Thus, the court will treat the Company's statement concerning job security as uncontroverted.

**2.** Technically, selection for machinist training did not involve a promotion since machinists are paid the same rate as journeymen printers and are entitled to the same job security.

Based on these facts, the Company advances three principal contentions: (1) that the plaintiff has failed to establish a prima facie case of sex discrimination; (2) that, even assuming this initial burden has been discharged, the Company has articulated a legitimate, nondiscriminatory reason for Hayden's non-selection, *i.e.*, a good-faith, mistaken belief that she was not interested in the machinist position; and (3) that the plaintiff has not proven that the Company's proffered reason is a pretext. In response, the plaintiff argues that summary judgment should be denied because the Company has not proven the absence of a dispute of material fact.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a case of discriminatory denial of employment, the Supreme Court articulated the elements of a prima facie showing under Title VII. The complainant must show:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. Emphasizing that this standard was not to be rigidly applied, the Court added the following footnote: "The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n.13, 93 S.Ct. at 1824 n.13. *Accord, Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 1094 n.6, 67 L.Ed.2d 207 (1981).

■ In our view, Hayden's claim can best be analyzed as an alleged failure to promote.[3] Heeding the admonition in *McDonnell*, lower federal courts have formulated a somewhat different standard in failure to promote cases. To establish a prima facie case, a plaintiff must show that (1) she belongs to a protected group; (2) she was qualified for and applied for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied. *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981), *citing Kunda v. Muhlenberg College*, 463 F.Supp. 294, 307 (E.D.Pa.1978), *aff'd* 621 F.2d 532 (3d Cir. 1980); *cf. Lee v. Bolger*, 454 F.Supp. 226, 230 (S.D.N.Y.1978) (adopting similar test); *Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972, 980 (E.D.Mo.), *aff'd* 552 F.2d 220 (8th Cir. 1976) (same).

■ Once the plaintiff has proven by a preponderance of the evidence a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employment decision. *Burdine*, 101 S.Ct. at 1093. As the *Burdine* Court observed:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

---

**3.** In her brief, the plaintiff argues that "there is a real question as to whether or not Plaintiff even was absent on the day employees were asked a second time about their continuing interest." Plaintiff's Brief at 21. The Company has demonstrated that the second poll was conducted by the Union on October 17, 1979. Defendant's Reply Brief, Affidavit of J. Green. The Company's attendance records indicate that Hayden was off that day. Plaintiff's Brief, Exh. 1, Attachment 1. Furthermore, Hayden states that these reports accurately reflect her attendance at work, Plaintiff's Brief, Affidavit of J. Hayden, Exh. 1 at ¶ 7. Therefore, the court concludes that there is no genuine issue as to whether Hayden was absent when the second poll was conducted.

101 S.Ct. at 1094–95 (footnotes omitted). At this stage, however, it is important to note that the ultimate burden of persuasion remains, as it does at all times, with the plaintiff. *Id.* at 1093. Finally, should the defendant discharge this production burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.*

The Company first contends, relying on *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), that Hayden has not established a prima facie case of sex discrimination. In *Jefferies*, a case involving a failure-to-promote claim, the Fifth Circuit followed the *McDonnell* formula in analyzing whether a prima facie case had been made out. Nevertheless, we believe that since a more precise test than *McDonnell* has been devised in the failure-to-promote context, Hayden's claim should be examined in light of that test, and not *Jefferies*.

█ Hayden is a member of a protected group. As a journeyman printer, she was qualified for machinist training and applied for it. Defendant's Brief, Exh. 14, Affidavit of E. Sweat. She was denied the position, while another employee, who the Company concedes was less qualified, was selected. The question whether Hayden was considered for the position is more difficult to resolve. When the Union initially polled the journeymen in the Composing Room, Hayden expressed an interest in the machinist position and was listed as such. However, when the Union polled the journeymen a second time, on October 17, 1979, Hayden was absent from work. She was not subsequently contacted to determine if she was still interested in the position. The list submitted by the Union to Guthrie, the Assistant Foreman of the Composing Room, reflected this fact. Nevertheless, Hayden did notify several union officials that she

was still interested. Furthermore, while Sweat, the Foreman of the Composing Room, attests that his selection of a male printer apprentice for the machinist position was made with the understanding that none of the journeymen were interested, Defendant's Brief, Exh. 14, Affidavit of E. Sweat,[4] it appears that Guthrie spoke to him concerning his choice. Defendant's Reply Brief, Exh. 1, Affidavit of R. Guthrie. In view of Guthrie's comments about Hayden, the court finds that the Company has not established the absence of an issue of material fact with respect to whether Hayden was considered for the machinist position. Thus, Hayden's claim is not appropriate for summary adjudication.

Although we do not reach the question whether the Company has asserted a legitimate, nondiscriminatory reason for Hayden's non-selection, the following observations are in order. In her brief, the plaintiff urges this court to adopt the approach taken by the District of Columbia Court of Appeals in *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981) in analyzing this question. There, as here, the plaintiff presented claims of sexual harassment and denial of promotion. Because the court found that the plaintiff had proven that she was a victim of sexual harassment "as a matter wholly independent of her claim for back pay and promotion," 641 F.2d at 952, it modified the *McDonnell* formula to permit the plaintiff to "enter the ritual of order of proof at an advantage over the typical Title VII plaintiff . . . ." *Id.* Thus, the court stated that once a prima facie case is made out,

> the employer then must bear the burden of showing, by clear and convincing evidence, that he had legitimate nondiscriminatory reasons for denying the claimant the promotion. As in *McDonnell*, if the employer successfully rebuts the prima facie case, the claimant should still have

4. With respect to his decision, Sweat states:
> I am still not sure whether the Union intended to tell me that none of the journeymen were interested or whether they assumed I would know that Ms. Hayden had

not been contacted a second time due to her absence. In any event, there appears to have been a misunderstanding concerning her interest in the position.
Defendant's Brief, Exh. 14, at 3.

the opportunity to prove that the employer's purported reasons were mere pretexts.

*Id.* at 953.

*Bundy* was decided on January 12, 1981. Two months later, the Supreme Court rendered the *Burdine* decision. Reversing the Fifth Circuit, the Court held that the lower court had misconstrued the nature of the burden that *McDonnell* and its progeny place on the defendant. The Court emphasized that " 'the employer's burden is satisfied if he simply "explains what he has done" or "provid[es] evidence of legitimate nondiscriminatory reasons." ' " 101 S.Ct. at 1093, *quoting Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 296 n.2, 58 L.Ed.2d 216 (1978). In view of this holding, we have serious reservations about the continuing validity of the approach formulated in *Bundy*. Therefore, we decline to adopt it.

### B. *Termination of Salary Continuation Benefits*

Under the collective bargaining agreement negotiated between the Company and the Union, the Company has the obligation to pay the regular salary of an employee who is temporarily disabled as the result of an on-the-job injury. This benefit is known as the salary continuation benefit (hereinafter "SCB"). The SCB continues until the Company's doctor or the doctor to whom the employee has been referred releases the employee to return to work. Defendant's Brief, Exh. 4, Affidavit of W. H. Garmon. Payment of the SCB is independent from worker's compensation benefits; however, if an employee receives workers' compensation, the SCB is reduced by the amount of compensation received. *Id.*

On November 17, 1979, Hayden suffered an on-the-job injury.[5] Several days later, on November 20, 1979, Hayden reported her injury to the Company which referred her to the Howell Industrial Clinic for an examination. Defendant's Brief, Exh. 4. At this time, the Company commenced payment of the SCB to Hayden. *Id.* She was then sent to Dr. Shure, an orthopedic specialist, who recommended that she return to work on November 26, 1979. Apparently, Hayden did not return to work but instead requested permission from the Company's insurance carrier to seek treatment from a chiropractor. *Id.* Upon receiving permission, Hayden made two visits to a chiropractor. Because the chiropractor failed to submit reports relating to Hayden's treatment or prognosis, the insurance carrier refused to reimburse Hayden for further visits. *Id.*

On January 8, 1980, Hayden visited another orthopedic specialist, Dr. Cabot. *Id.* He recommended that she stay out of work for one week and return then for a checkup. One week later, on January 15, 1980, Hayden returned for treatment. Dr. Cabot recommended that she remain out for two more weeks and thereafter return to work on a light duty basis.[6] Hayden visited Dr. Cabot again on January 29, 1980. At that time, he recommended that she return to work on February 4, 1980. *Id.*, Attachment II.

The Company paid Hayden the SCB from mid-November until February 4, 1980. When Hayden did not return to work on February 4, 1980 and did not provide the Company with a letter from any medical doctor indicating that she was unable to work, W. H. Garmon, the Director of Employee Benefits, ordered that Hayden's SCB be discontinued. Defendant's Brief, Exh. 4, Affidavit of W. H. Garmon.

In support of its motion for summary judgment, the Company contends that since Hayden's alleged disability was not documented by a medical doctor, termination of the SCB was justified. Additionally, the Company asserts that the termination deci-

---

5. The circumstances surrounding Hayden's injury will be discussed in Part II.C., *infra.*

6. Apparently, when an employee is placed on "light duty" due to an injury, he is permitted to perform work that will not exacerbate his con-

dition and to be excused from work for medical treatment. Plaintiff's Brief, Exh. 5, Affidavit of L. Burnett. However, there is no evidence demonstrating that light duty entitles an employee to the SCB.

sion was made without knowledge of Hayden's sexual harassment allegations. Opposing this motion, Hayden argues that several male employees "have been permitted to produce evidence of disability based upon the reports of treating chiropractors." Plaintiff's Brief at 8. Furthermore, Hayden asserts, the Company knew of Hayden's allegations of sexual harassment at the time the SCB was terminated.

■ The crux of a disparate treatment claim brought under Title VII is that similarly situated individuals have been treated differently on the basis of an impermissible classification. *See Franklin v. Crosby Typesetting Co.*, 411 F.Supp. 1167, 1172 (N.D. Tex.1976), *aff'd* 568 F.2d 1098 (5th Cir. 1978), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). During the course of the instant litigation, Hayden has attempted to show disparate treatment by focusing on the benefits paid to several male employees: T. Sheridan, C. Harrellson, C. Greenstreet, L. Burnett, M. Smith, and B. Skinner. To determine whether a prima facie case of disparate treatment has been made out, we consider each of these employees in sequence.

Sheridan injured his back on the job on January 17, 1979 when a chair on which he was sitting broke. He was sent to the Howell Industrial Clinic for examination and referred to an orthopedic specialist, Dr. P. White, who indicated that Sheridan was temporarily disabled as a result of the injury. Accordingly, the Company paid Sheridan the SCB from January 18, 1979 until March 19, 1979. Defendant's Brief, Exh. 4, Affidavit of W. H. Garmon. On March 19, 1979, Dr. White recommended that Sheridan return to work on a half-day basis. Apparently, because he was still considered disabled, the Company continued paying him the SCB. *Id.* On May 18, 1979, Dr.

White reported that Sheridan could return to work full-time. However, since Sheridan had already resumed full-time status, the Company terminated the SCB effective May 16, 1979.[7]

Hayden attempts to dispute the Company's version of these facts. She submits that Sheridan was restricted to working half-time for only one week subsequent to March 19, 1979, and that the Company elected to pay him the SCB for a substantial period of time thereafter. Plaintiff's Brief, Exh. 3, 4. To support this allegation, Hayden relies on a "certificate for return to work" signed by Dr. White on March 19, 1979 in which Dr. White states that Sheridan shall work "one-half time this week." Plaintiff's Brief, Exh. 3. Defendant counters this allegation by arguing that this note merely reflects Dr. White's instruction for that particular week. *See* Defendant's Reply Brief, Exh. 3, Attachments 5K, 5L. Furthermore, the defendant insists, this same instruction remained in effect until Dr. White finally released Sheridan for full-time work in May 1979. Defendant's Reply Brief, Exh. 3, Attachments 5J, 5K, 5L. The evidence indisputably demonstrates that the Company paid the SCB to Sheridan only while he was considered disabled by his doctor. Thus, the Company's treatment of Sheridan did not differ from that of Hayden.

Harrellson, an employee working in the Composing Room, injured his back initially on May 28, 1977. He was considered disabled and remained under the care of Dr. W. Wood until January 5, 1978. During this period of time, Harrellson received the SCB. The benefit was terminated upon his return to work. Defendant's Brief, Exh. 4, Affidavit of W. H. Garmon. On June 23, 1980, Harrellson suffered a recurrence of

---

7. There appears to be some confusion in the record with respect to the date Sheridan began to work full-time. In its brief, the Company states that Sheridan began to work full-time on May 16, 1979, and therefore, the SCB was terminated as of this date. Defendant's Brief at 10. Garmon attests that Sheridan began to work full-time on May 9, 1979. *See* Defendant's Reply Brief, Affidavit of W. H. Garmon.

In addition, Sheridan's attendance report reflects that he returned full-time on May 9, 1979. The Company does not explain this inconsistency. However, the court notes that this apparent dispute of fact does not bear on the crucial question in the present case: whether the Company's refusal to continue Hayden's SCB upon a chiropractor's recommendation of disability constitutes sex discrimination.

his back injury. He was treated by Dr. D. B. Bickers and stayed out of work until August 21, 1980. During this period, Harrellson received the SCB. Again, the benefit was terminated upon his return to work. Plaintiff does not dispute these facts. In light of this evidence, it is clear that Harrellson is not similarly situated to Hayden.

We reach the same conclusion as to Greenstreet, who also worked in the Composing Room. While at work, on October 10, 1979, Greenstreet complained of numbness and loss of feeling in the right side of his body. He was sent to Crawford Long Hospital, where he was examined by the Company's doctor. Since this illness was not considered an on-the-job injury, the Company did not pay Greenstreet the SCB. These facts are uncontroverted.

Burnett, a former Company employee, suffered two on-the-job injuries in 1970 and 1974. On both occasions, he was treated by medical doctors and placed on light duty for several months. Defendant's Reply Brief, Affidavit of W. H. Garmon. In March 1977, Burnett injured his shoulder and neck and stayed out of work for approximately one month under the care of a medical doctor. *Id.* Subsequently, in June 1978, Burnett's shoulder problems began to recur. He was off approximately ten days while under the treatment of a medical doctor. When he returned to work, he was placed on light duty at the instructions of his doctor. *Id.* Throughout the remainder of 1978, Burnett remained under the care of two medical doctors, Dr. Kurtz and Dr. Howell. In addition, he was placed on light duty. Dr. Howell, the Company's doctor, referred Burnett to a chiropractor and recommended that the Company's insurance carrier pay for such treatment. Defendant's Reply Brief, Affidavit of W. H. Garmon, Attachment 1. While undergoing chiropractic treatment, Burnett remained on light duty as recommended by his medical doctor, and continued to receive the SCB. *Id.*

In our view, Burnett is not similarly situated to the plaintiff. Over a ten-year period of time, Burnett was treated by the Company's doctor as well as other medical doctors for shoulder and back problems. When these problems recurred in 1978, Burnett was treated by two medical doctors and placed on light duty. At the time Burnett sought chiropractic treatment, he did so under the supervision of his medical doctor who had independently determined that Burnett should be placed on light duty. Moreover, at no time did Burnett receive the SCB solely upon the recommendation of his chiropractor. On the other hand, Hayden sought chiropractic treatment after her medical doctor released her for return to work on February 4, 1980. Hayden's continuing disability has not been documented by a medical doctor. Thus, unlike Burnett, Hayden seeks to receive the SCB solely on the basis of her chiropractor's diagnosis.

Hayden next directs the court's attention to the Company's handling of Smith's injury. In late 1975, Smith was injured and examined by Dr. Sowell. In December 1975, Dr. Sowell referred Smith to a chiropractor for a period of six months. *See* Defendant's Reply Brief, Affidavit of W. H. Garmon. Subsequently, in June 1977, Smith requested permission to undergo chiropractic treatment. He was informed that he would have to be referred by the Company's doctor if he wanted the Company to pay for the treatment. There is no evidence demonstrating that Smith visited a chiropractor nor that he received the SCB during that period of time. Thus, he was treated no differently than Hayden.

Finally, Hayden refers the court to the Company's payment of benefits to employee Skinner. He injured his back on the job in April 1975. While continuing to work, Skinner sought treatment from a chiropractor. There is no indication that he was placed on light duty or that he received the SCB during this period. Several months later, Skinner suffered another on-the-job injury. At this time, he was treated by a chiropractor. However, he was not placed on light duty or paid the SCB. Then, in February 1980, Skinner injured his back again. He was treated by a chiropractor who recommended light duty for two

weeks. Although Skinner was apparently placed on light duty by the Company, he did not receive the SCB.

■ In sum, none of the employees cited by Hayden received the SCB solely based upon the recommendation of their chiropractor. Moreover, those employees who did receive the SCB while undergoing treatment by a chiropractor were also under the care of a medical doctor. Hayden has not pointed to a single instance in which the Company continued to pay a male employee the SCB upon the recommendation of disability by a chiropractor after a medical doctor had released him for work. In the absence of such evidence, the court finds that Hayden has not proven disparate treatment based on sex.

Hayden advances two other contentions to buttress her allegation of sex discrimination. Hayden first argues that since the Worker's Compensation Board considered her to be completely disabled on the basis of her chiropractor's diagnosis, "it is totally specious for the Defendant to claim that the decision to cut off Ms. Hayden's salary continuation benefits was based upon the absence of any competent 'medical evidence.'" Plaintiff's Brief at 9. The Company refutes this argument, claiming that the Board's determination of an employee's benefits is not binding on the Company.

In support of its position, the Company details its treatment of a male employee, M. Watkins. Although Watkins was not employed as a printer journeyman in the Composing Room, he was eligible for the SCB. Defendant's Brief, Exh. 4, Affidavit of W. H. Garmon. In December 1978, Watkins claimed to be disabled as a result of an on-the-job injury. *Id.* The Company refused to pay him the SCB because it concluded that his injury was not job-related or disabling. *Id.* The Company's insurance carrier also refused to pay Watkins worker's compensation benefits. In August 1980, the State Board of Worker's Compensation ruled that Watkins' injury was compensable and ordered the Company's carrier to commence payment of benefits. Despite Watkins' renewed application for the SCB, the Company refused, and continues to refuse, to pay him the benefit. On the basis of this undisputed evidence, the court finds that the Company treated Hayden no differently than Watkins, a male employee.

■ Similarly, the court finds Hayden's second argument, that the Company terminated the SCB because Hayden complained of sexual harassment, to be unavailing. Garmon, the Company's Director of Labor Relations, states that he was unaware of Hayden's claim of sexual harassment when he terminated her benefits on February 4, 1980. Defendant's Brief, Exh. 4. The only evidence Hayden offers to rebut this denial is the charge that, after Hayden's injury, Sweat, Foreman of the Composing Room, notified all supervisors that sexual harassment would not be tolerated by the Company. Thus, Hayden urges, "[i]t is logical to assume that Mr. Garmon had some knowledge of the events surrounding Ms. Hayden's disability prior to making any decision regarding it."[8] Plaintiff's Brief at 9. This unsupported inference is insufficient to create a genuine issue of fact with respect to Garmon's knowledge.

Thus, although summary judgments are disfavored in employment discrimination cases, the court concludes that the Company has proven the absence of an issue of material fact relating to its termination of Hayden's SCB, and that it is entitled to judgment as a matter of law.

### C. *Sexual Harassment*

Hayden's claim of sexual harassment arises principally from two incidents that occurred on November 17, 1979. The first incident involved J. Lamberth, a co-employee and union official. According to the Company, Lamberth was walking down an aisle in the Composing Room, while Hayden

---

8. The Company has established that this alleged meeting occurred in April 1980, several months after Hayden's benefits had been terminated, and that the meeting was prompted by a complaint about another alleged incident of sexual harassment. Defendant's Reply Brief, Affidavit of W. H. Garmon. Hayden has not presented any evidence to controvert this fact.

was leaning against a high desk with her back to the aisle. As Lamberth approached her, Hayden stretched out her foot as if to trip him. When he reached Hayden, he "bumped into her with his leg." Defendant's Brief, Exh. 16, Affidavit of J. E. Lamberth; Exh. 17, Affidavit of J. Harris. On the other hand, Hayden states that she made no effort to trip Lamberth. Deposition of J. Hayden at 337, 338, 472. Rather, he "bumped" her and would not have, had she been a male.[9]

Later that same day, two other Composing Room employees, R. Hardin, Assistant Foreman, and C. Bryant, met Hayden in a hallway while returning from the cafeteria. It is Hardin's testimony that he was in a hurry and attempted to pass Hayden who was walking slowly in the same direction. Deposition of R. Hardin at 32. As he approached Hayden, Hardin states, "I raised my knee and tapped her on the cheek of her rump, and she turned around and hit me in the stomach." State Board of Worker's Compensation Hearing, May 13, 1980, at 21. Bryant, however, describes the incident differently. He states that Hayden was standing in the hallway, talking to another employee. Id. at 32. When Hardin passed her, he bumped Hayden with his knee. Id. Hayden argues that "inasmuch as Mr. Hardin admitted that his conduct was not something in which he would engage with other male employees, it is apparent that sex was the motivating factor in his acts toward Plaintiff." Plaintiff's Brief at 27.

On November 18, 1979, the following day, Hayden called in sick. Upon her return to work, she told Sweat, Foreman of the Composing Room, that she had suffered a back injury due to these two incidents. Sweat referred Hayden to the Howell Industrial Clinic.[10] Once informed of Lamberth's and Hardin's conduct, Sweat warned both em-

ployees orally that the Company considered their conduct unacceptable. Defendant's Brief, Exh. 14, Affidavit of E. Sweat. Apparently, no further disciplinary action was taken.

Hayden characterizes these instances as part of a pattern of sexual harassment that permeated the working environment at the Company, creating an unreasonably hostile atmosphere. In its motion for summary judgment, the Company contends that these incidents involved mere "horseplay," that Hayden's compilation of other incidents is irrelevant to the instant action, and thus, that Hayden has failed to establish a prima facie case of sex discrimination.

 It is well recognized that Title VII provides a cause of action for sexual harassment. See, e.g., Bundy v. Jackson, 641 F.2d 934 (D.C.Cir.1981); Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044 (3d Cir. 1977); Barnes v. Costle, 561 F.2d 983 (D.C.Cir.1977); Hall v. F. O. Thacker Co., 24 FEP 1499 (N.D.Ga.1980). Title VII states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges or employment, because of such individual's * * * sex * * [.]

42 U.S.C. § 2000e–2(a)(1). In the present case, Hayden does not claim that the alleged sexual harassment resulted in any adverse action.[11] Rather, relying on the Equal Employment Opportunity Commission's Guidelines on Sexual Harassment in the Workplace, 29 C.F.R. §§ 1604.11, et seq. (hereinafter "EEOC Guidelines"), she urges that the conduct of the Company's employees had either "the purpose or effect of

---

**9.** While it is undisputed that Lamberth never physically touched Hayden prior to the above incident, Dep. of J. Hayden at 131, 347, Hayden states that he frequently approached her in an intimidating and sexual manner. Id. at 340–41.

**10.** Hayden's subsequent absence from work and medical treatment is discussed in detail in

Part II.B., supra, of this order, and therefore, we need not restate these facts.

**11.** Cf. Hall v. F. O. Thacker Co., 24 FEP 1499 (N.D.Ga.1980) (plaintiff claimed that her supervisor's sexual advances were a term or condition of her employment in that refusal of those advances resulted in her discharge).

unreasonably interfering with her performance or created an intimidating, hostile or offensive work environment." Plaintiff's Brief at 25. This allegation raises a question of first impression in this jurisdiction: Does Title VII proscribe a discriminatory work environment, regardless of whether the complaining employee lost any tangible job benefits as a result of discrimination?

The EEOC Guidelines define sexual harassment broadly:

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

(b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11(a), (b). In addition, the Guidelines hold an employer responsible for discriminatory acts of its agents and supervisory employees with respect to sexual harassment just as with other forms of discrimination, regardless of whether the employer authorized or knew or even should have known of the acts, 29 C.F.R. § 1604.-11(d), and for sexual harassment committed by nonsupervisory employees if the employer authorized, knew of, or should have known of such harassment. *Bundy v. Jackson*, 641 F.2d at 947. These administrative guidelines are to be accorded great defer-ence by the courts in determining legislative intent, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where they do not conflict with earlier pronouncements of the agency. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

■ The precise issue raised by Hayden's claim has been heretofore addressed only by the District of Columbia Court of Appeals in *Bundy v. Jackson*. There, the court embarked on a comprehensive discussion of the relevant caselaw in this area. Relying principally on *Rogers v. Equal Employment Opportunity Commission*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) (employer violated Title VII where it created discriminatory and offensive environment for its Hispanic employees), the court commented on "the special importance of allowing women to sue to prevent sexual harassment without having to prove that they resisted the harassment and that their resistance caused them to lose tangible job benefits." 641 F.2d at 945. To hold otherwise would mean that:

... so long as the sexual situation is constructed with enough coerciveness, subtlety, suddenness, or one-sidedness to negate the effectiveness of the woman's refusal, or so long as her refusals are simply ignored while her job is formally undisturbed, she is not considered to have been sexually harassed. C. MacKinnon, Sexual Harassment of Working Women 46–47 (1979). It may even be pointless to require the employee to prove that she "resisted" the harassment at all. So long as the employer never literally forces sexual relations on the employee, "resistance" may be a meaningless alternative for her. If the employer demands no response to his verbal or physical gestures other than good-natured tolerance, the woman has no means of communicating her rejection. She neither accepts nor rejects the advances; she simply endures them. She might be able to contrive proof of rejection by objecting to the employer's advances in some very visible

and dramatic way, but she would do so only at the risk of making her life on the job even more miserable. . . .

*Id.* at 945–46. In the absence of Fifth Circuit precedent, we find this reasoning compelling and adopt the *Bundy* court's holding that sexual harassment violates Title VII when an employer creates or condones a substantially discriminatory work environment regardless of whether the complaining employee loses any tangible job benefits as a result of discrimination. *Id.* at 943.

In deciding whether the conduct of the Company's employees had the purpose or effect of unreasonably interfering with Hayden's work performance or created an intimidating, hostile, or offensive work environment, the *Bundy* decision again provides guidance. The plaintiff in *Bundy* was employed by the District of Columbia Department of Corrections. Bundy repeatedly rejected sexual propositions from fellow employees and supervisors. For example, her second-line supervisor continually called her into his office to request that she spend the workday afternoon with him at his apartment and to question her about her sexual proclivities. 641 F.2d at 940. In addition, her first-line supervisor asked her to join him at a motel and on a trip to the Bahamas. *Id.* When Bundy complained about these advances to her supervisors' superiors, she was told "any man in his right mind would want to rape you. . . ." *Id.*

Hayden's claims of sexual harassment fall far short of the egregious conduct present in *Bundy*. However, in light of the evidence presented by the parties on this issue, the court finds that a factual dispute exists as to whether the Company's employees' conduct constituted sexual harassment. Thus, it is not possible on summary adjudication to determine if Hayden has established a prima facie case of sex discrimination. Accordingly, the Company's motion for summary judgment on Hayden's allegation of sexual harassment will be denied, and the case will proceed to a trial on the merits.

Accordingly, the defendant's motion to dismiss plaintiff's claim for compensatory damages is GRANTED. Plaintiff's cause of action based on 42 U.S.C. § 1981 is DISMISSED. The defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.